WILLIAMS & CONNOLLY LLP
David S. Kurtzer-Ellenbogen (*pro hac vice*)
Daniel A. Martinez (*pro hac vice*)
Alexander C. Gaudio (*pro hac vice*)
dkurtzer@wc.com
gmartinez@wc.com
agaudio@wc.com
680 Maine Ave., S.W.
Washington, DC 20024
(202) 434-5000 / FAX (202) 434-5029

PROSKAUER ROSE LLP
Myron D. Rumeld (*pro hac vice*)
mrumeld@proskauer.com
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

Kelly Marie Curtis (Cal. Bar No. 313581)
kcurtis@proskauer.com
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone: (310) 557-2900
Facsimile: (310) 557-2193

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| GREGG BERKELEY et al., | Civil Action No. 5:23-cv-00343-EJD |
| *Plaintiffs*, | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| INTEL CORPORATION et al., | |
| *Defendants*. | Hearing Date: December 11, 2025 |
| | Time: 9:00 a.m. |
| | Courtroom: 4 |
| | Judge: Hon. Edward J. Davila |

**NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS
OR FOR SUMMARY JUDGMENT**

Please take notice that on December 11, 2025, at 9:00 a.m. in Courtroom 4 of the San Jose Courthouse of the United States District Court for the Northern District of California, before the Honorable Judge Edward J. Davila, Defendants Intel Corporation and Administrative Committee of the Intel Minimum Pension Plan will and hereby do move for judgment on the pleadings or for summary judgment.

Defendants seek an order entering judgment and dismissing with prejudice all claims.  In the alternative, Defendants seek an order of partial summary judgment.  The grounds for Defendants' motion are set forth in the Memorandum of Points and Authorities below.  In further support of the motion, Defendants submit a supporting declaration and exhibits attached thereto. Pursuant to the Court's Standing Order, Defendants have also attached a Separate Statement identifying each claim as to which Defendants contend there is no genuine issue to be tried.

Respectfully submitted,

Dated: September 12, 2025

By: /s/ David S. Kurtzer-Ellenbogen

WILLIAMS & CONNOLLY LLP
David S. Kurtzer-Ellenbogen (*pro hac vice*)
Daniel A. Martinez (*pro hac vice*)
Alexander C. Gaudio (*pro hac vice*)
dkurtzer@wc.com
gmartinez@wc.com
agaudio@wc.com
680 Maine Ave., S.W.
Washington, DC 20024
(202) 434-5000 / FAX (202) 434-5029

PROSKAUER ROSE LLP
Myron D. Rumeld (*pro hac vice*)
mrumeld@proskauer.com
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

Kelly Marie Curtis (Cal. Bar No. 313581)
kcurtis@proskauer.com
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone: (310) 557-2900
Facsimile: (310) 557-2193

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

FACTS .....................................................................................................................3

    A.    Background. ...............................................................................3

    B.    Plaintiff's Theory. ....................................................................4

    C.    Plaintiff's Claims. ....................................................................5

LEGAL STANDARD ...............................................................................................5

ARGUMENT ...........................................................................................................6

I.    "ACTUARIAL EQUIVALENCE" DOES NOT REQUIRE ASSUMPTIONS TO BE CONTINUALLY UPDATED FOR "REASONABLENESS." ...................................8

    A.    When Congress Wants to Require "Reasonableness," It Says So. ..........................9

    B.    The IRS Regulation Is Unenforceable and Inapposite. ..........................................10

    C.    There is No Basis to Treat the § 417(e) Assumptions as the Legal Minimum for JSA Conversions. ..................................................13

    D.    The Court Should Follow the Reasoning of the Courts That Have Held There is No Reasonableness Requirement Implicit in "Actuarial Equivalence". ...................15

II.    THE COURT ALTERNATIVELY SHOULD NARROW THE TRIAL ISSUES. ..........18

    A.    The PBGC Rate Is Reasonable as a Matter of Undisputed Material Fact. ............19

    B.    GAM-83 Was Undisputedly Reasonable During Much of the Class Period.........21

III.    THE COURT SHOULD DISMISS THE FIDUCIARY DUTY CLAIM...........................23

    A.    The Court Should Dismiss the Breach of Fiduciary Duty Claim Entirely. ...........23

    B.    At a Minimum, the Court Should Confirm That no Breach of Fiduciary Duty Claim is Available as to Benefits Commenced Before January 2017. .........25

CONCLUSION.......................................................................................................25

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

## CASES

*Adams v. U.S. Bancorp*, 635 F. Supp. 3d 742 (D. Minn. 2022)....................................16

*Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981) ..........................................6

*Ass'n Civilian Technicians, Silver Baron Chapter v. FLRA*, 200 F.3d 590 (9th Cir. 2000)..........11

*Belknap v. Partners Healthcare Sys., Inc.*, 588 F. Supp. 3d 161 (D. Mass. 2022)................ passim

*Bloate v. United States*, 559 U.S. 196 (2010) ..................................................16

*Bufkin v. Collins*, 604 U.S. ___, 145 S. Ct. 728 (2025) .........................................12

*Cal. Pub. Emps. Ret. Sys. v. ANZ Secs., Inc.*, 582 U.S. 497 (2017)................................25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................5, 18

*Conkright v. Frommert*, 559 U.S. 506 (2010)......................................................18

*Covic v. FedEx Corp.*, 774 F. Supp. 3d 954 (W.D. Tenn. 2024)...............................10, 11, 16, 17

*Crandall v. Starbucks Corp.*, 249 F. Supp. 3d 1087 (N.D. Cal. 2017)..............................23

*Drummond v. S. Co. Servcs., Inc*, 2024 WL 4005945 (N.D. Ga. July 30, 2024)  ..............9, 11, 15

*Drummond v. S. Co. Servs., Inc.*, No. 24-12773 (11th Cir.) ......................................15

*Franklin v. Duke Univ.*, 2024 WL 1740479 (M.D. N.C. Apr. 23, 2024) ..............................16

*Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ...........................6, 10

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) .....................................................10, 14

*Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Hawaii Pension Plan*, 891 F.3d 839 (9th Cir. 2018)..........................................................................8

*Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99 (2013)..............................24

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) ...........................................23

*King v. Burwell*, 576 U.S. 473 (2015)............................................................8

*Kottom v. Walker*, 2015 WL 7301849 (N.D. Cal. Nov. 19, 2015) ...................................18

*Loper-Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ..........................................11

*Masten v. Metro. Life Ins. Co.*, 543 F. Supp. 3d 25 (S.D.N.Y. 2021) ........................16, 20

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007) ...........................................20

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) .................................................................................6

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000) ................................5

*Paieri v. W. Conf. of Teamsters Pension Tr.*, 2024 WL 3455269
    (W.D. Wash. June 21, 2024) .........................................................................................................16

*Pegram v. Herdrich*, 530 U.S. 211 (2000) ............................................................................................23

*Polanco v. E. Chi. Mach. Tool Corp.*, 2012 WL 12886209 (C.D. Cal. June 26, 2012) ...............18

*Rakofsky v. Mercedes-Benz USA, LLC*, 2024 WL 1329923 (N.D. Cal. Mar. 27, 2024) ................5

*Reichert v. Bakery, Confectionary, Tobacco Workers & Grain Millers Pension Comm.*,
    2024 WL 5410419 (E.D. Mich. Apr. 17, 2024).............................................................2, 10, 16, 18

*Reichert v. Kellogg Co.*, No. 24-1442 (6th Cir.) ..................................................................................15

*Russello v. United States*, 464 U.S. 16, 23 (1983) ....................................................................10, 16

*Scmid v. Cnty. of Sonoma*, 2021 WL 1118077 (N.D. Cal. Mar. 24, 2021).....................................5

*Scott v. AT&T, Inc.*, ___ F. Supp. 3d ___, 2025 WL 1903673 (N.D. Cal. July 9, 2025) ..10, 17, 24

*Sierra Club v. Johnson*, 614 F. Supp. 2d 998 (N.D. Cal. 2008) ......................................................12

*Smith v. Rockwell Automation, Inc.*, 438 F. Supp. 3d 912 (E.D. Wis. 2020) .............................14

*Specht v. Jensen*, 853 F.2d 805 (10th Cir. 1998) (en banc) ............................................................18

*Stephens v. US Airways Grp., Inc.*, 644 F.3d 437 (D.C. Cir. 2011) ......................................7, 8, 22

*Tarleton LLC v. State Farm Fire & Cas. Co.*, 2014 WL 2126567 (D. Or. May 21, 2014)...........23

*Urlaub v. CITGO Petroleum Corp.*, 2022 WL 523129 (N.D. Ill. Feb. 22, 2022) ........................16

*Urlaub v. CITGO Petroleum Corp.*, 750 F. Supp. 3d 863 (N.D. Ill. 2024)............................20, 25

*US Airways, Inc. v. McCutchen*, 569 U.S. 88 (2013) ..........................................................................6

*Van Asdale v. Int'l Game Tech.*, 577 F.3d 989 (9th Cir. 2009) ......................................................23

*Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004) ................................................23

*Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012) .............................................................................23

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

## STATUTES AND REGULATIONS

26 U.S.C. § 401(a) ............................................................................................................11

26 U.S.C. § 417(e) ....................................................................................................... passim

29 U.S.C. § 1002(21)(A) ..................................................................................................23

29 U.S.C. § 1055(d) ..................................................................................................... passim

29 U.S.C. § 1055(g) ...............................................................................................1, 8, 14

29 U.S.C. § 1083 ...............................................................................................................10

29 U.S.C. § 1084 ...............................................................................................................10

29 U.S.C. § 1085 .................................................................................................................9

29 U.S.C. § 1085a .........................................................................................................9, 10

29 U.S.C. § 1102(a)(1) .....................................................................................................24

29 U.S.C. § 1104(a)(1)(B) ...............................................................................................24

29 U.S.C. § 1113(1) .........................................................................................................25

29 U.S.C. § 1202(c) .........................................................................................................11

29 U.S.C. § 1393(a) ...........................................................................................................9

Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829
(1974) .............................................................................................................................10

26 C.F.R. § 1.401(a)(4)-12 ........................................................................................12, 13

26 C.F.R. § 1.401(a)-11(b)(2) ..................................................................................... passim

42 Fed. Reg. 1463 (Jan. 7, 1977) ....................................................................................12

## OTHER AUTHORITY

Fed. R. Civ. P. 56(a) .....................................................................................................5, 18

The Federalist No. 78 (A. Hamilton) ...............................................................................11

# TABLE OF CITED EXHIBITS[*]

Exhibit 1:    Intel Minimum Pension Plan (Jan. 1, 2020), produced at BERK0001560 along with the First Amendment to that plan (Jan. 1, 2021), produced at BERK0001558

Exhibit 2:    Expert Report of Thomas S. Terry (Sept. 12, 2024)

Exhibit 3:    Intel Minimum Pension Plan (Jan. 1, 1988), produced at BERK0000822

Exhibit 4:    Expert Rebuttal Report of Thomas S. Terry (Dec. 11, 2024)

Exhibit 5:    Ian Altman Deposition Transcript (excerpts) (Jan. 28, 2025)

Exhibit 6:    Transcript of oral argument on Plaintiff's motion for class certification (excerpts) (May 1, 2025)

Exhibit 7:    Letter from Gary G. Quintiere and Elizabeth F. Drake to Internal Revenue Service seeking a private letter ruling related to the MPP (Jan. 22, 2014), produced at BERK0093141

Exhibit 8:    Letter from William B. Hulteng to Ronald Dickel providing a private letter ruling related to the MPP (Oct. 8, 2014), produced at BERK0142670

Exhibit 9:    Expert Report of Ian H. Altman, FSA in this matter (Sept. 12, 2024)

Exhibit 10:   Expert Report of Ian H. Altman, FSA, *Traylor, Moses v. Avnet, Inc.*, No. 08-0918-PHX-FJM (D. Ariz. May 29, 2009)

Exhibit 11:   James Chakan Deposition Transcript (excerpts) (Aug. 9, 2024)

---

[*] All exhibits are to the Declaration of David S. Kurtzer-Ellenbogen.

# INTRODUCTION

Plaintiff's position in this case is fundamentally rooted in a policy argument:  As human longevity has lengthened since the Intel Minimum Pension Plan ("MPP") was set up in 1988, should joint and survivor annuity ("JSA") conversions take that into account?  JSAs paid out by the MPP would be slightly higher if certain mortality tables Plaintiff prefers were used when converting the MPP's default single life annuities ("SLAs") into JSAs.  Plaintiff contends that SLA-to-JSA conversions therefore should be performed using those preferred tables, and moreover that certain specific actuarial assumptions codified at 26 U.S.C. § 417(e) represent the minimum permissible assumptions for JSA conversions.

But Congress has not adopted that policy.  It is undisputed that many actuarial conversions performed in ERISA-governed pension plans are governed only by the terms of the plan contract despite the identical policy question being presented.  Indeed, Plaintiff's counsel emphasized at the class certification hearing that certain MPP conversions *other* than JSA conversions *can and should* be performed using the same allegedly "outdated and unreasonable" actuarial assumptions at issue in this case, and that this raises no ERISA concerns.  The question here is thus one of Congressional intent—i.e., whether, in the specific context of JSA conversions, Congress intended an ongoing "reasonableness" standard requiring the use of "updated" actuarial assumptions that produce JSA benefits no lower than those calculated using the § 417(e) assumptions.  It did not.

The plain text of the statutory provision governing JSA conversions says only that the starting SLA benefit and ending JSA benefit must be "actuarial[ly] equivalent."  29 U.S.C. § 1055(d).  The statute does not say anything about reasonableness, even though Congress, on many occasions elsewhere in ERISA, expressly mandated "reasonable actuarial assumptions."  And within the same statutory section, Congress expressly directed that the § 417(e) assumptions are the minimum actuarial assumptions to be used for *lump sum conversions*, yet Congress said nothing of the sort regarding *JSA conversions*.  29 U.S.C. § 1055(g).  Principles of statutory construction permit no inference that Congress required "reasonableness" in § 1055(d) without saying so, nor any inference that Congress intended the § 417(e) actuarial assumptions to represent

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

the minimum reasonable assumptions for JSA conversions. For these reasons, several courts have recently dismissed similar claims to those presented here.

"[T]he Court must apply the law that Congress passed" and cannot "make new policy." *Reichert v. Bakery, Confectionary, Tobacco Workers & Grain Millers Pension Comm.*, 2024 WL 5410419, at *2 (E.D. Mich. Apr. 17, 2024). The issue Plaintiff has raised should be presented to Congress for consideration, not decided by the federal courts. In evaluating that argument, Congress could also evaluate contrary arguments. As a second court dismissing a JSA conversion claim noted, it is by no "means obvious that the result" of declining to find a reasonableness requirement hidden in § 1055(d) "is irrational or unfair." *Belknap v. Partners Healthcare Sys., Inc.*, 588 F. Supp. 3d 161, 176 (D. Mass. 2022). There are policy arguments both for and against Plaintiff's position, *see, e.g.*, *id.*, but those arguments should be presented to Congress for consideration. The courts must apply the law that Congress passed, and should not undertake to make new policy, particularly in the context of ERISA's careful and reticulated scheme. Consistent with these rulings, the Court should enter judgment dismissing all claims.

If the Court permits Plaintiff's "reasonableness" theory to advance, Intel will defend the reasonableness of its assumptions, both standing alone and as part of the MPP's overall design. But the Court should enter partial summary judgment with respect to aspects of the MPP's actuarial equivalence assumptions as to which there is no material dispute of fact regarding reasonableness. *First*, the Court should find the interest rate used in the MPP for SLA-to-JSA conversions (the "PBGC Rate") reasonable as a matter of undisputed material fact. Plaintiff contends the PBGC Rate is unreasonable, but his only support for that proposition is his expert's bare assertion that the PBGC Rate is "not market-based." Yet that expert undermines this uncited and unsupported assertion, and concedes that the PBGC Rate is reasonable, by simultaneously contending that the § 417(e) interest rate—*which during portions of the class period was based on PBGC rates*—is *per se* reasonable. With his expert's purported explanation for the unreasonableness of the PBGC Rate untenable, Plaintiff has no evidence of unreasonableness. The Court should find the PBGC Rate reasonable as a matter of undisputed material fact.

*Second*, if there is to be a trial over the reasonableness of the mortality assumption, it should be limited to the period between 2021 and the present. Plaintiff contends that the mortality table used by the MPP for JSA conversions (the "GAM-83" table) is "40 years out of date" and that all JSA annuities calculated since 1995 have been undervalued. But Plaintiff has no *evidence* of that, only the *ipse dixit* of an expert who has separately testified that the reasonableness of a mortality table is *not* a mere function of its year of publication, because such tables have a built-in "margin" to account for future longevity increases. He testified that, for this reason, the GAM-71 table remained reasonable for JSA conversions 38 years later, into 2009 (the year of that testimony). Because it is undisputed that GAM-83 has the same or greater margin as GAM-71—Plaintiff's expert testified to that, too—GAM-83 must have remained reasonable for JSA conversions for at least the same duration, into 2021. For this reason, if there is to be a trial over the reasonableness of GAM-83, it should be limited to the period between 2021 and the present.

Finally, the Court should dismiss Count III for breach of fiduciary duty. It is not the duty of a fiduciary (the Administrative Committee) to set plan terms; that is the responsibility of the plan sponsor (Intel Corporation). The committee's responsibility was to apply the terms of the plan, which it did—there is no allegation that any JSA has been miscalculated based on the terms of the plan. Nor could the Court find at trial that the committee failed to act prudently in not anticipating *in 1995* an interpretation of § 1055(d) first propounded in litigation *in 2018*, and as to which there is still no appellate authority nor a single final judgment for any plaintiff. Should the Court reject these arguments, it should at a minimum dismiss Count III as to all class members whose JSA annuities began before January 23, 2017, in view of ERISA's six-year statute of repose.

## FACTS

### A.     Background.

Intel established the MPP in 1988 as a backstop to its defined contribution Retirement Contribution Plan ("RCP"). Ex. 1 § 1. Based on tenure and pay, the MPP determines a minimum monthly annuity for each participant, expressed as an SLA. Ex. 2 ¶¶ 48-50. If a participant's RCP benefit (expressed as an SLA) exceeds that minimum, the participant has no MPP benefit, but if

the RCP benefit falls below that minimum, the MPP makes up the difference. *Id.* ¶ 52.  Though MPP benefits are first calculated as SLAs, a participant may elect another form, such as a lump sum payment or a JSA. *Id.* ¶ 53.

When the MPP was established, it specified the 1983 Group Annuity Mortality table ("GAM-83") and an adjustable interest rate determined using a Pension Benefit Guaranty Corporation methodology (the "PBGC Rate") as the actuarial assumptions to be used consistently in determining "actuarial equivalence" in all contexts, including, among others (1) converting the value of a participant's RCP account into an SLA to determine any MPP benefit and (2) converting an MPP SLA benefit into other optional benefit forms. Ex. 3 § 2.02; Ex. 2 ¶¶ 58-60 & n.20.  Since then, whenever Congress required the use of specific actuarial assumptions in particular contexts, such as in the conversion of SLAs *to lump sum payments*, a carve out was made in the MPP's definition of actuarial equivalence for those requirements. Ex. 4 ¶ 27; Ex. 1 § 2(a).  Because there has been no such change regarding the assumptions used to determine the actuarial equivalence of SLAs and JSAs, the MPP continues to use GAM-83 and the PBGC Rate for that purpose.[1]

## B.    Plaintiff's Theory.

Plaintiff Gregg Berkeley commenced his JSA annuity in late 2022.  He does not contend that his or anyone else's monthly benefit has been miscalculated or that the terms of the MPP have been violated or misapplied.  His theory, rather, hinges on two related but distinct predicates.

*First*, Plaintiff contends that ERISA requires that actuarial assumptions used to convert an SLA to a JSA must be "reasonable," and that the MPP violates ERISA because it uses "outdated and unreasonable" actuarial assumptions to determine JSAs. *E.g.*, Compl. ¶¶ 22, 66, 71.  This

---

[1] It is undisputed that the plan's existing actuarial assumptions yield far higher benefits to participants than if the alternative assumptions Plaintiff identifies had been applied consistently throughout the MPP.  Plaintiff contends this is irrelevant to whether the existing assumptions are "reasonable."  Defendants believe that "reasonableness," an inherently flexible standard, permits consideration of the overall structure of a plan.  But that question is reserved for trial if necessary.

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

theory is focused almost entirely on the GAM-83 mortality table, which Plaintiff characterizes as "40 years out of date," *id.* ¶¶ 11, 61; the Complaint says almost nothing about the PBGC Rate.

*Second*, Plaintiff contends that the actuarial assumptions Congress established at 26 U.S.C. § 417(e) as the minimum *for lump sum conversions* are also the legal minimum *for JSA conversions*. Plaintiff defined his class that way, and Plaintiff's expert now contends that any JSA even a penny lower than one generated by the § 417(e) assumptions is unreasonable and unlawful. Compl. ¶¶ 14, 35 90; ECF 86 at 10; Ex. 5 at 82, 206.

### C.    Plaintiff's Claims.

Count I claims a breach of ERISA's requirement that JSAs be actuarially equivalent to SLAs. Count II presumes such a breach, and claims that for this reason, there has been a violation of ERISA's anti-forfeiture rules. Count III asserts a breach of fiduciary duty by the MPP's Administrative Committee.

## LEGAL STANDARD

"Judgment on the pleadings is appropriate if, assuming the truth of all material facts pled in the complaint, the moving party is entitled to judgment as a matter of law." *Rakofsky v. Mercedes-Benz USA, LLC*, 2024 WL 1329923, at *2 (N.D. Cal. Mar. 27, 2024). It is "functionally identical" to a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Id.* (citation omitted).

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the moving party does not bear the ultimate burden of proof, it can satisfy its summary judgment burden by identifying "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Then, the burden "shifts to the nonmoving party to produce evidence to support its claim or defense." *Scmid v. Cnty. of Sonoma*, 2021 WL 1118077, at *2 (N.D. Cal. Mar. 24, 2021) (cleaned up). "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact," summary judgment should be awarded. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

**ARGUMENT**

Congress has enacted no legislation that required Intel to change the MPP's actuarial assumptions for JSA conversions, let alone to set those assumptions using § 417(e) as a floor, as Plaintiff contends. The plain language of ERISA says nothing about needing to regularly update pension plan contract terms to keep them "reasonable," and ERISA's structure permits no such inference. Intel is therefore entitled to judgment on all claims.

ERISA is a "comprehensive and reticulated" statute enacted after Congress' "careful study" of retirement plans. *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 (1981). Its "carefully crafted and detailed enforcement scheme" is "strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254 (1993) (emphasis in original). Courts thus should be "reluctant to tamper with [that] scheme" by "extending remedies not specifically authorized." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002).

ERISA's "principal function," rather, is "to protect contractually defined benefits." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013). It is undisputed that all MPP participants have received their contractually-defined benefits. Seeking the creation of a new ERISA remedy, Plaintiff argues that the plan document—the contract—violates ERISA because every MPP JSA annuity since 1995 was not "actuarially equivalent" to its corresponding SLA benefit as required by 29 U.S.C. § 1055(d)(1)(B). He contends that "actuarial equivalence" requires, and has always required, regular updates to actuarial assumptions to ensure that they remain "reasonable," and that the MPP assumptions put in place in 1988 have been unreasonable since at least 1995.

But "actuarial equivalent" does not mean that actuarial assumptions specified in a plan are subject to ongoing, iterative review for reasonableness.[2] Rather, "[t]wo modes of payment are

---

[2] Section 1055(d) has required that SLAs and JSAs be "actuarially equivalent" since ERISA was first enacted in 1974, but it was not until 2018 that a wave of plaintiffs asserted that this requires plan sponsors to continually update the assumptions used to convert JSAs. *See* ECF 92 at 2 n.1.

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

actuarially equivalent when their present values are *equal under a given set of actuarial assumptions*." *Stephens v. US Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added); *see also Belknap*, 588 F. Supp. 3d at 170, 174-75 (quoting Plaintiff's expert to same effect). It is undisputed that that is true here.

When Congress wanted ERISA plan sponsors to be bound by a reasonableness requirement, it said so. When Congress wanted specific actuarial assumptions to serve as a minimum value for conversions, it said that. Congress said neither here regarding JSAs. Searching for a hook, Plaintiff argues that "reasonable" actuarial assumptions are required by a tax regulation, but that regulation is not enforceable under ERISA and anyway has been mischaracterized. Because no law required Intel to change the MPP's actuarial assumptions for JSA conversions, let alone to set those assumptions using § 417(e) as a floor, Intel is entitled to judgment on all claims.

Even if the Court disagrees, the Court should still narrow the areas of dispute by confirming that there is no disputed material issue of fact with respect to the reasonableness of certain MPP assumptions at certain relevant times. On the now-closed record, Plaintiff's sweeping contention that both the mortality and interest rate assumptions have been unreasonable since 1995 is untenable. If needed, Intel will show at trial that the MPP's approach to actuarial equivalence is reasonable today, even if limited to JSA conversions and particularly in the context of Intel's unusual "floor-offset" plan. But the Court should narrow that question to the reasonableness of the mortality assumption, and to the period where there is an actual dispute as to its reasonableness.

Lastly, the Court should grant summary judgment to the Administrative Committee on Count III for breach of fiduciary duty. Plaintiff alleges that the committee breached its fiduciary duties by not taking action with respect to the MPP's actuarial assumptions. But the selection of actuarial assumptions is a settlor function, not a fiduciary action. Also, these fiduciaries should not face liability for claims going back 30 years for not having anticipated a new theory first articulated in litigation only a few years ago. In any event, ERISA's statute of repose flatly bars recovery for any participant who commenced benefits more than six years prior to the filing of the complaint, and such class members *cannot* recover for breach of fiduciary duty here.

## I.    "ACTUARIAL EQUIVALENCE" DOES NOT REQUIRE ASSUMPTIONS TO BE CONTINUALLY UPDATED FOR "REASONABLENESS."

At the heart of this case are Plaintiff's contentions that the assumptions used to convert an SLA benefit to a JSA must be "reasonable," *e.g.*, Compl. ¶¶ 16, 22, 34, and that the § 417(e) assumptions are the minimum threshold for reasonableness (i.e., that any JSA lower than it would have been using the § 417(e) assumptions violates ERISA), *id.* ¶¶ 14, 90; *see also* ECF 86 at 10, Ex. 5 at 206. But ERISA does not say either of those things. It says only that a JSA must be "the actuarial equivalent" of the corresponding SLA. 29 U.S.C. § 1055(d)(1)(B). The "plain words of the statute" and the "provisions made therein for enforcement and relief" are the beginning and, when unambiguous, the end of a dispute as to a statute's meaning. *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Hawaii Pension Plan*, 891 F.3d 839, 844 (9th Cir. 2018). "Whether the language is plain depends on context and the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 486 (2015).

Actuarial equivalence simply means that "[t]wo modes of payment" are "equal under a given set of assumptions." *Stephens*, 644 F.3d at 440. The term implies no "reasonableness" standard but rather articulates a mathematical principle. Unlike in certain contexts such as 29 U.S.C. § 1055(g) where specific actuarial assumptions are required, "actuarial equivalence" under § 1055(d) leaves plan sponsors the discretion to select actuarial assumptions based on the structure and design of that specific plan. In adopting the MPP in 1988, Intel specified in the plan documents that actuarial equivalence should be determined in all instances using the PBGC Rate and GAM-83 table. Ex. 3 § 2.02. Those assumptions have remained in place except where Congress has mandated otherwise, Ex. 1 § 2(a); Ex. 2 ¶¶ 58-60 & n.20. It is undisputed that no JSA benefit has been less than required under the plan terms.

That undisputed fact and the plain language of ERISA suffice for summary judgment. But principles of statutory construction also confirm two things as a matter of law. *First*, the term "actuarially equivalent" does not carry an unarticulated "reasonableness" limitation. *Second*, there is no statutory or other legal support for the proposition that the § 417(e) assumptions urged by Plaintiff represent a *per se* floor for reasonableness.

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

The Court should enter judgment for Defendants on all claims.

## A. When Congress Wants to Require "Reasonableness," It Says So.

ERISA does not state that JSA conversions must be based on "reasonable" actuarial assumptions, *see* 29 U.S.C. § 1055(d), and Plaintiff is on record that certain other ERISA conversions also do not require that.[3] Over and over, Plaintiff insists that ERISA imposes a "reasonableness" requirement in the conversion of SLAs to JSAs. *E.g.*, Compl. ¶¶ 16, 22, 34, 62-66, 71, 79, 84-85, 126. Plaintiff is mistaken. "[T]he omission of a reasonableness requirement is telling," *Drummond v. S. Co. Servcs., Inc*, 2024 WL 4005945, at *5 (N.D. Ga. July 30, 2024), and the Court should "assume that any such omission from the text of ERISA is deliberate." *Belknap*, 588 F. Supp. 3d at 170.

Elsewhere in ERISA, Congress repeatedly mandated "reasonable" actuarial assumptions, showing that Congress knew how to require that standard when it deemed it appropriate. In 29 U.S.C. § 1393(a), for instance, Congress required employers to compute withdrawal liability using actuarial methods that "in the aggregate[] are reasonable (taking into account the experience of the plan and reasonable expectations)." Elsewhere, in setting certain funding rules related to "endangered" plans, Congress mandated that such plans (1) use "reasonable actuarial estimates, assumptions, and methods" for annual certifications, 29 U.S.C. § 1085(b)(3)(B)(i), (2) adopt funding improvement plans based on "reasonable actuarial assumptions," *id.* § 1085(c)(3)(A), and (3) use "reasonable actuarial assumptions" when developing "rehabilitation plans," *id.* § 1085(e)(3)(A)(i). In the next section of ERISA, Congress addressed minimum funding standards generally, requiring that plan asset valuations be performed through a "reasonable actuarial method of valuation," 29 U.S.C. § 1085a(c)(2)(A), and—with the header "Actuarial Assumptions Must Be Reasonable"—specified that for purposes of minimum funding under that section, plan factors must be determined "on the basis of actuarial assumptions and methods … each of which is

---

[3] *See, e.g.*, Ex. 6 at 7 ("They're allowed to use the 83 GAM for the offset"), 15 ("Intel is allowed" to "us[e] an old mortality for the offset").

reasonable," 29 U.S.C. § 1085a(c)(3)(A).    Many of the same "reasonableness" requirements feature in 29 U.S.C. §§ 1083 and 1084 as well, addressing funding standards for single-employer and multi-employer plans.[4]    Congress required reasonable actuarial assumptions *five times* in ERISA and used the term "reasonable" *76* times, *but not in 29 U.S.C. § 1055(d)*.

It is unsurprising that there are numerous contexts in which ERISA expressly requires "reasonableness."    Reasonableness is a familiar concept in the law.    But Congress did not include that requirement in § 1055.    "If Congress intended to include a reasonableness requirement in § 1055, it would have done so[,] [a]nd the Court must assume th[at] omission was intentional." *Reichert*, 2024 WL 5410419, at *2; *see also Covic v. FedEx Corp.*, 774 F. Supp. 3d 954, 957 (W.D. Tenn. 2024) (holding that § 1055(d) has no "reasonableness" requirement; "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).    It is a "familiar principle of statutory construction … that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006).    This Court should not judicially impose upon § 1055(d) language that is not there, particularly given courts' "reluctance," *see Great-W. Life*, 534 U.S. at 209, to read into ERISA requirements and remedies not apparent on its face.

**B.    The IRS Regulation Is Unenforceable and Inapposite.**

Plaintiff relies repeatedly on a regulation that states that, *for the purpose of determining*

---

[4] These "reasonableness" requirements and § 1055(d)'s "actuarial equivalence" requirement have been in place since ERISA's passage. Pub. L. No. 93-406, 88 Stat. 829 §§ 205(g)(3), 302(c)(2)(A), 1013(c)(2), (3).    A recent opinion denying summary judgment appears to have misunderstood this. *See Scott v. AT&T, Inc.*, ___ F. Supp. 3d ___, 2025 WL 1903673, at *6-7 (N.D. Cal. July 9, 2025) (denying summary judgment in part because reasonableness requirement added in 2014 was not "obvious guidance" as to what Congress meant by "actuarially equivalent" in 1974).

*the tax treatment of a retirement plan*, the actuarial equivalence of SLAs and JSAs "may be determined[] on the basis of consistently applied reasonable actuarial factors[.]" 26 C.F.R. § 1.401(a)-11(b)(2) (the "IRS Regulation"); Compl. ¶¶ 10, 38, 103. Plaintiff's theory hinges on this regulation. *See* Ex. 5 at 73-75 ("reasonable actuarial factors" must be applied "to be compliant with the regulation"). But the IRS Regulation is not enforceable under ERISA, nor is there any other basis to defer to it, and its permissive language cannot be read as mandatory. Where the IRS *does* define "actuarial equivalent," it does not require "reasonableness."

*First*, the IRS Regulation "is 'not enforceable under ERISA.'" *Drummond*, 2024 WL 4005945, at *6 (quoting *Belknap*, 588 F. Supp. 3d at 173). At 29 U.S.C. § 1202(c), Congress extended ERISA enforceability to certain Treasury regulations. *Id.* (codifying that regulations "under sections 410(a), 411, and 412 of Title 26 (relating to minimum participation standards, minimum vesting standards, and minimum funding standards, respectively)" are enforceable under ERISA). The IRS Regulation, though, is not prescribed under any of those ERISA-enforceable sections of the Tax Code, but rather under 26 U.S.C. § 401(a). Plaintiff mischaracterizes the IRS Regulation as "applicable" and "[e]choing" the ERISA statute. Compl. ¶ 10. The Court should "decline[] to write into [29 U.S.C.] § 1055(d) a requirement that appears solely under a Tax Code regulation—a regulation, moreover, that § 1202(c) does not extend to ERISA." *Drummond*, 2024 WL 4005945, at *6; *accord Belknap*, 558 F. Supp. 3d at 173; *Covic*, 774 F. Supp. 3d at 958.

*Second*, Plaintiff cannot invoke the IRS Regulation as warranting deference independent of whether the regulation is enforceable. The Secretary of the Treasury is not the appropriate agency official to interpret ERISA, as "courts do not owe deference to an agency's interpretation of a statute it is not charged with administering." *Ass'n Civilian Technicians, Silver Baron Chapter v. FLRA*, 200 F.3d 590, 592 (9th Cir. 2000). "Interpretation of the laws" is, moreover, the "proper and peculiar province of the courts." *Loper-Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting The Federalist No. 78, at 525 (A. Hamilton)). In overruling the longstanding *Chevron* doctrine, the Court made clear in *Loper-Bright* that "agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in

original).  The Court should accord no deference to the IRS Regulation in interpreting ERISA.[5]

*Third*, the IRS Regulation simply does not say what Plaintiff now reads it to require.  It states that actuarial equivalence for purposes of tax treatment "*may* be determined, on the basis of consistently applied reasonable actuarial factors, for each participant or for all participants or reasonable groupings of participants," if non-discrimination requirements are met.  26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added).  *Plaintiff deletes that permissive phrasing, replacing the words "may be" with ellipses*.  Compl. ¶ 103.  But the "customary meaning [of 'may'] is permissive," *Sierra Club v. Johnson*, 614 F. Supp. 2d 998, 1003 (N.D. Cal. 2008), while "'shall' imposes a mandatory command," *Bufkin v. Collins*, 604 U.S. ___, 145 S. Ct. 728, 737 (2025).

*Fourth*, it is impossible to construe "actuarial equivalence" to require "reasonableness" by virtue of this one, permissively-phrased, non-enforceable regulation because the only IRS regulation that actually defines the term "actuarial equivalent" says nothing of the sort.[6]  To the

---

[5] Nor is there any basis to think that the IRS agrees with Plaintiff's reading.  The IRS Regulation has had the language at issue here since 1977.  *See* 42 Fed. Reg. 1463, 1466 (Jan. 7, 1977).  Yet the IRS issued a Private Letter Ruling to Intel in 2014 based on correspondence that (among other things) *specifically flagged assumptions Plaintiff contends had by then been "unreasonable" under that regulation for 19 years*.  Ex. 7 at 7 n.9; Ex. 8; Ex. 4 ¶ 56.  Defendants are aware of no instance in which the IRS has applied this regulation as Plaintiff characterizes it.

[6] Not only that, but the IRS identifies "standard" assumptions *for actuarial equivalence* in non-discrimination testing—*one of which is GAM-83*.  26 C.F.R. § 1.401(a)(4)-12 (defining "Standard Mortality Table").  If IRS regulations unenforceable under ERISA were relevant (they are not), the definition in that same regulation of "Normalize," which *separately* requires (1) actuarial equivalence and (2) the use of "reasonable" assumptions would further reinforce that the term "actuarial equivalence," standing alone, carries no embedded expectation of "reasonable" actuarial assumptions.  *Id.* (establishing that GAM-83 is "reasonable" *per se* for that purpose).

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

contrary, just as in *Stephens*, the IRS defines "actuarial equivalent" as setting out a mathematical principle, not a subjective comparison: "An amount or benefit is the actuarial equivalent of, or is actuarially equivalent to, another amount or benefit at a given time if the actuarial present value of the two amounts or benefits (calculated using the same actuarial assumptions) at that time is the same." 26 C.F.R. § 1.401(a)(4)-12; *see also* Ex. 2 ¶ 65 n.23. The Court should not read the IRS Regulation to require something it does not require, especially when a related regulation defines actuarial equivalence without a reasonableness requirement.

### C. There is No Basis to Treat the § 417(e) Assumptions as the Legal Minimum for JSA Conversions.

That the term "actuarially equivalent" does not carry an implied "reasonableness" requirement is reinforced by how Plaintiff proposes to define "reasonable," wherein the minimum § 417(e) assumptions for lump sum conversions also would be the absolute legal floor for compliant JSA conversions. Plaintiff sought, and the Court certified, a class of all JSA recipients whose benefit is lower than if the § 417(e) assumptions had been used. Compl. ¶ 90; ECF 86 at 10; ECF 92 at 1-2. Plaintiff's expert Ian Altman testified that the § 417(e) assumptions are a floor for reasonableness, such that a JSA "a penny below" what § 417(e) would generate violates ERISA. Ex. 5 at 206.[7] But as a matter of statutory interpretation, in answering whether the term "actuarial equivalence" can sustain the meaning that Plaintiff wants it to carry, there is no way to layer a required § 417(e) floor onto the conversions of SLAs to JSAs.

The § 417(e) assumptions relate to the determination of *lump sum* benefits. They are mortality tables and interest rates published by the IRS that set the minimum present value of a lump sum if a plan wants favorable tax treatment. *See* 26 U.S.C. § 417(e). There, Congress tied the Tax Code to ERISA in a manner that it has *not* done for JSAs, *see supra* at 11, mandating in 29 U.S.C. § 1055(g) that such lump sums must be determined using the assumptions published by

---

[7] This is an evolution from the Complaint, where Plaintiff characterized the § 417(e) assumptions as just one possible alternative. Compl. ¶ 22 ("such as"), 63 ("for example").

1    the IRS pursuant to § 417(e).  Thus, in the very same statute, 29 U.S.C. § 1055, Congress:

2        (1) At subsection (d), set rules for the conversion of SLAs to JSAs, which must only be

3            "actuarial[ly] equivalent"; and

4        (2) At subsection (g), set rules for the conversion of annuities into immediately payable

5            lump sums, which must be no less than the value using the § 417(e) assumptions.

6    Plaintiff argues that hidden in *subsection (d)* is a requirement that conversions be no less than the

7    value using the § 417(e) assumptions discussed at *subsection (g)*.  But Congress clearly knew how

8    to require the § 417(e) assumptions as a minimum, and it did not do that for JSA conversions, even

9    though it did so immediately thereafter.  *See Hamdan*, 548 U.S. at 578 (negative inference may be

10   drawn where one provision excludes language included in others of same statute).

11       Plaintiff's approach to the § 417(e) assumptions is particularly untenable considering the

12   cross-cutting impact of those assumptions.  In the context of lump sum conversions, participants

13   prefer *low* interest rates.  Concerned that sponsors were setting rates too high, Congress mandated

14   that lump sum payouts be no less than what § 417(e) would deliver.  In the context of JSA

15   conversions, though, participants prefer *higher* interest rates.  Plaintiff's thesis is that § 417(e),

16   which sets the *highest* possible rate for lump sum conversions, also sets the *lowest* possible rate

17   for JSA conversions.  If Congress wanted this categorical approach, it would have said so.

18       Plaintiff's insistence that § 417(e) sets an absolute floor for the reasonableness of JSA

19   conversions is a tactical necessity for his case.  He needs it to bind his class together, as otherwise

20   countless other reasonable alternative assumptions would yield disparate outcomes.  But his

21   premise fails as a matter of law or logic—there simply is nothing in ERISA that can possibly be

22   read to establish a § 417(e) minimum for determining JSAs.  Even in ruling *against* the defendant

23   in a recent case (where the requirement of reasonableness was not contested), one court recently

24   agreed that "ERISA likely does not require that plans use any specific mortality table or any

25   specific interest rate at any given time."  *Smith v. Rockwell Automation, Inc.*, 438 F. Supp. 3d 912,

26   921 (E.D. Wis. 2020).  The Court should reject Plaintiff's premise that § 417(e) sets a legal

27   minimum for JSA conversions.

28

1

**D.    The Court Should Follow the Reasoning of the Courts That Have Held There is No Reasonableness Requirement Implicit in "Actuarial Equivalence."**

2

There are no appellate decisions addressing whether the term "actuarial equivalence" in

3

§ 1055(d) impliedly requires "reasonable" assumptions.[8]  District courts have reached differing

4

decisions, but the cases declining to find that implied requirement have the better reasoning.

5

In *Belknap*, an early case, the court converted a motion to dismiss into a motion for

6

summary judgment and held that the statutory term "actuarially equivalent" cannot be read to carry

7

an underlying reasonableness requirement.  588 F. Supp. 3d at 177.[9]  The statute itself does not

8

provide for it, nor does any applicable regulation or case law.  *Id.* at 171-73.  Ultimately, "the only

9

relevant place where 'actuarial equivalence' is defined is in the Plan itself."  *Id.* at 175.  The court

10

concluded that the proper way to define "actuarial equivalence" (undefined in the statute) is in the

11

plan's definition, by "refer[ring] to the plan documents to determine the actuarial assumptions used

12

to calculate an actuarially equivalent benefit."  *Id.* at 174-75.  This outcome does not mean that

13

sponsors have "unfettered discretion" over benefits—they must state assumptions expressly in the

14

contract—nor, as discussed below, is it irrational or unfair.  *Id.* at 175-77; *see infra* at 18.

15

Several subsequent decisions are in accord.  In *Drummond*, the same plaintiff's counsel as

16

here brought the same basic claims against a different sponsor.  2024 WL 4005945, at *2.  As in

17

*Belknap*, the court correctly concluded that ERISA does not mandate "reasonable" assumptions in

18

this context, given the "omission of a reasonableness requirement" in ERISA's text.  *Id.* at *5-6.

19

"ERISA's careful and detailed drafting" precluded the court from reading into the statute a

20

requirement that did not exist.  *Id.*  In *Reichert*, too, the court viewed the omission of a

21

22

[8] Appeals are pending in the Sixth and Eleventh Circuits.  *See Reichert v. Kellogg Co.*, No. 24-1442

23

(6th Cir.) (argued May 8, 2025); *Drummond v. S. Co. Servs., Inc.*, No. 24-12773 (11th Cir.) (to be

24

argued September 17, 2025).

25

[9] The *Belknap* plaintiff took a JSA calculated as an early retirement benefit, so he wanted a lower

26

interest rate, even as Plaintiff is suing for a higher interest rate for *his* JSA.  *Id*. at 166.

27

28

1   reasonableness requirement in 29 U.S.C. § 1055(d) as "telling," as Congress expressly imposed a

2   reasonableness standard in other related contexts.  2024 WL 5410419, at *2.  As in *Belknap* and

3   *Drummond*, the court in *Reichert* concluded that it could not judicially impose a requirement

4   absent from ERISA's text.  *Id.*  Most recently, in *Covic*, that court emphasized that "courts should

5   generally find that the omission of specific language that Congress uses elsewhere in a statute was

6   intentional."  774 F. Supp. 3d at 957 (citing *Russello*, 464 U.S. at 23).

7          In contrast to those decisions, the cases that have found an unarticulated reasonableness

8   requirement implied in 29 U.S.C. § 1055(d) have done so based on weaker reasoning, often

9   revealing their policy perspective.  *See, e.g.*, *Urlaub v. CITGO Petroleum Corp.*, 2022 WL 523129,

10  at *6 (N.D. Ill. Feb. 22, 2022) ("[I]t cannot possibly be the case that ERISA's actuarial equivalence

11  requirements allow the use of unreasonable mortality assumptions."); *Masten v. Metro. Life Ins.*

12  *Co.*, 543 F. Supp. 3d 25, 35 (S.D.N.Y. 2021) ("[S]ome limits on the discretion of plan

13  administrators in the selection of actuarial methodology are necessary to effectuate the protective

14  purposes of ERISA.").  Some decisions have been expressly grounded in the unenforceable and

15  inapposite IRS Regulation.[10]  Others have grafted a reasonableness requirement into 29 U.S.C.

16  § 1055(d), ignoring principles of statutory analysis, simply by referring to their preferred

17  dictionary definitions of "equivalent."  *E.g.*, *Urlaub*, 2022 WL 523129, at *6 (citing Merriam-

18  Webster); *Paieri v. W. Conf. of Teamsters Pension Tr.*, 2024 WL 3455269, at *10 (W.D. Wash.

19  June 21, 2024) (same).  *Cf. Belknap*, 588 F. Supp. 3d at 175 (rejecting this analysis).  But that

20  approach isolates the statutory terms from their context, yielding an interpretation that "fails to

21  account fully for the text and structure" of ERISA.  *Bloate v. United States*, 559 U.S. 196, 205 n.9

22  (2010) (rejecting statutory interpretation that "rests upon a dictionary definition of two isolated

23  words" and "does not account for the governing statutory context").

24          In this District, Judge Donato recently denied summary judgment in *Scott*.  But the

25  _____

26  [10] *See, e.g.*, *Franklin v. Duke Univ.*, 2024 WL 1740479, at *2 (M.D. N.C. Apr. 23, 2024); *Adams*

27  *v. U.S. Bancorp*, 635 F. Supp. 3d 742, 752 (D. Minn. 2022).

28

reasoning in that opinion is not persuasive and this Court should not adopt it. Judge Donato correctly observed that the IRS Regulation "does not do all the work plaintiffs ask of it," and thus "does not directly answer the central question," albeit for different reasons than demonstrated here. 2025 WL 1903673, at *4 (not examining the enforceability of or deference due the IRS Regulation). The opinion also correctly noted that there is no on-point appellate authority, *id.*, and that certain asides in opinions the plaintiffs invoked were more "fairly characterized as dicta," *id.* In denying summary judgment, *Scott* thus rested principally on the opinions of those plaintiffs' expert—like here, Ian Altman. *Id.* at *5. Judge Donato mainly focused on Altman's characterization of certain Actuarial Standards of Practice (ASOPs). *Id.* But none of the cited ASOPs relate to the selection of assumptions *for actuarial equivalence in calculating and paying JSAs. See id.* (citing ASOPs related to funding obligations and other topics). They also "only use the suggestive 'should' rather than the mandatory 'shall' present in other parts of ERISA and § 1055." *Covic*, 774 F. Supp. 3d at 958 (rejecting interpretative value of same ASOPs). In any event, the plan at issue in *Scott* uses "tabular factors" rather than defined actuarial assumptions to determine JSAs. 2025 WL 1903673 at *2 & n.3. Those tabular factors were, the parties agreed, "'black box' factors without a traceable origin." *Id.* at *3. That is a far cry from the present context, where the MPP's operation, and its determination of actuarial equivalence, have always been fully transparent.

Ultimately, "[t]he meaning of actuarial equivalence is a matter of law, not fact." *Covic*, 774 F. Supp. 3d at 958-59; *see also Belknap*, 588 F. Supp. 3d at 169 ("The issue presented is one of statutory interpretation, which is a matter of law for the court to decide.").[11] "[E]xpert opinion regarding the correct statutory interpretation" of this term "is neither relevant nor appropriate."

---

[11] Although *Belknap*'s holding is grounded in ERISA's structure, the court found no inconsistency in the opinions of Ian Altman, who served as those plaintiffs' expert as well, who "unambiguously testified that if a plan defines 'actuarial equivalence,' then the actuary should use the plan's actuarial assumptions to calculate a participant's benefit." *Belknap*, 588 F. Supp. 3d at 174.

1  *Polanco v. E. Chi. Mach. Tool Corp.*, 2012 WL 12886209, at \*5 n.27 (C.D. Cal. June 26, 2012);

2  *see also Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1998) (en banc) ("[A]n expert witness may

3  not give an opinion on ultimate issues of law.").  The Court should decline to follow *Scott.*

4  <center>* * * * *</center>

5  Plaintiff's policy argument may have facial appeal.  Even in dismissing the plaintiffs'

6  claims, the court in *Reichert* "sympathize[d] with [their] position."  2024 WL 5410419, at \*2.  "But

7  the Court must apply the law that Congress passed" and cannot "make new policy."  *Id.*  Nor is it

8  by any "means obvious that the result" of judgment for Defendants would be "irrational or unfair."

9  *Belknap*, 588 F. Supp. 3d at 176.  After all, pension plans are "private arrangements" that "are not

10 generally required to provide protection against various forms of economic or social change," such

11 as cost of living adjustments, even though that, too, "might appear unfair."  *Id.*  And it is precisely

12 to "induce employers to offer" benefits in the first place that ERISA promises employers "a

13 predictable set of liabilities."  *Conkright v. Frommert*, 559 U.S. 506, 517 (2010).  "[I]f fairness

14 requires the imposition of a reasonableness standard, [Congress] is of course free to enact

15 appropriate legislation."  *Belknap*, 588 F. Supp. 3d at 176-77.  But it is not a requirement of ERISA

16 today.  The Court should not find a reasonableness requirement in 29 U.S.C. § 1055(d) where none

17 exists, should reject the premise that the § 417(e) assumptions represent an unarticulated minimum

18 basis for JSA conversions, and should enter judgment for Defendants on all claims.

19 ## II.    THE COURT ALTERNATIVELY SHOULD NARROW THE TRIAL ISSUES.

20 If the Court disagrees with Defendants and finds a reasonableness requirement implied in

21 "actuarial equivalence," it should narrow the issues in dispute so that a trial can be most efficient.

22 Rule 56(a) expressly contemplates summary judgment on "part" of a claim or defense.  *See, e.g.*,

23 *Kottom v. Walker*, 2015 WL 7301849 (N.D. Cal. Nov. 19, 2015); *Celotex Corp. v. Catrett*, 477 U.S.

24 317, 327 (1986) (summary judgment is not a "disfavored procedural shortcut," but rather "integral"

25 to the rules in promoting prompt and efficient resolution).  In opposing class certification,

26 Defendants argued that the reasonableness of the MPP's assumptions requires different evidence

27 at different times and thus may yield differing answers.  Although the Court determined that this

28

<center>18</center>
<center>DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT</center>

argument did not preclude class certification because it found the question "whether ERISA requires 'reasonable' actuarial assumptions for SLA to JSA conversions" to be a common one, ECF 92 at 4, the Court expressly agreed that if reasonableness is required, the evidence to answer that question will be different, such that "answers may differ over time," *id.* at 5.

If necessary, Defendants will demonstrate that the MPP's actuarial assumptions have been reasonable at all times for JSA conversions, whether examined in isolation or (as Defendants believe is appropriate) in the overall context of the MPP. But the Court should limit the trial question to the reasonableness of GAM-83 between 2021 and the present.

## A.    The PBGC Rate Is Reasonable as a Matter of Undisputed Material Fact.

First, the Court should narrow the issues in dispute in this case by confirming that even if the law requires that actuarial assumptions used for JSA conversions be "reasonable," the PBGC Rate is reasonable for such conversions as a matter of undisputed material fact.

A central premise of Plaintiffs' case is that the § 417(e) interest rate is reasonable *per se* for SLA-to-JSA conversions. *E.g.*, Compl. ¶¶ 35, 63; Ex. 9 at 19. And it is undisputed that the IRS based the § 417(e) interest rate on PBGC rates for extended periods of time, including five years of the class period in this case. Ex. 4 ¶ 52 & n.34 (§ 417(e) interest rate was based on PBGC rates until 2000). The Court should find, to start, that there is no material dispute of fact that the PBGC Rate was reasonable during the period between 1995 and 2000 when the § 417(e) interest rate *was based on PBGC rates*. *Id.*

But the fatal flaw in Plaintiff's position extends beyond the year 2000. Although Plaintiff's Complaint discusses mortality in detail, *e.g.*, Compl. ¶¶ 11, 54-63, 74-78, when it comes to the MPP's interest rate assumption, the Complaint offers no reasoning at all. Plaintiff alleges that the MPP's JSA conversions should have been performed using the § 417(e) interest rate instead of the PBGC Rate, but there is not one allegation in the Complaint articulating *why* that should be so. *See* Compl. *passim*. In discovery, Plaintiff's expert Ian Altman offered a single unsupported paragraph as to why he now contends that the PBGC Rate is unreasonable. Ex. 9 at 15. He asserts

that "the PBGC rates specified in the Plan are not market-based interest rates and therefore do not reflect the time value of money anyone would experience." *Id.*

The problem with this rationale is that it is irreconcilable with Altman's premise that the § 417(e) interest rate is definitionally reasonable for SLA-to-JSA conversions. The IRS used PBGC rates for the § 417(e) interest rate for years. The IRS thus *cannot* have viewed PBGC rates as unreasonable because those rates supposedly are untethered to the market, as Altman contends; if that argument were correct, the IRS could not have used PBGC rates for the § 417(e) rate at *any* time.[12] And where an interest rate was reasonable when it was put into place, "ERISA does not require plans to update their interest rate assumptions." *Masten*, 543 F. Supp. 3d at 34 (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 207 (2d Cir. 2007)).[13] Altman's sole argument against the PBGC Rate, articulated in a single sentence, thus fails on its own terms. The Court should find the PBGC Rate reasonable for JSA conversions as a matter of undisputed material fact.

Altman also asserts that the MPP applies its interest rate *as of the wrong date*—i.e., that whatever interest rate the MPP uses for JSA conversions, the MPP should be using the rate in

---

[12] It is undisputed that the variable PBGC Rate changes based on economic and market conditions, in that "the PBGC sets [the PBGC Rate] based on its analysis of annuity purchase rates and other input from the marketplace." Ex. 4 ¶ 50. In virtually all other recent "actuarial equivalence" cases, the interest rate in use was fixed. *See, e.g.*, *Urlaub v. CITGO Petroleum Corp.*, 750 F. Supp. 3d 863, 867 (N.D. Ill. 2024) (fixed 8% rate); *Belknap*, 588 F. Supp. 3d at 166 (fixed 7.5% rate). Remarkably, while Plaintiff argues that the PBGC Rate was too low for his JSA conversion, the *Belknap* plaintiff argued that a 7.5% rate was too *high* for *his* JSA conversion, because in the context of early retirement benefits, *lower* rates yield *higher* benefits. *Belknap*, 588 F. Supp. 3d at 166. Because actuarial assumptions cut different ways in different contexts, there is a Goldilocks nature to these cases; someone can always claim an assumption is too high or too low.

[13] In the context of *McCarthy*, it was undisputed that reasonableness was required.

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

effect on the date of benefit commencement rather than the rate in effect on the date of termination of employment. Ex. 9 at 15. This proposition is absent altogether from the Complaint. It is also uncited, which is not surprising given the fact that plainly nothing in § 1055(d) mandates any particular timing, let alone the specific timing Altman proposes. The Court can and should reject this *ipse dixit*, which is unsupported as a matter of law. But even if the Court determines that *the timing* of MPP benefit determinations is a matter for trial, it should still establish that that is the only triable issue with respect to interest rates.

## B.    GAM-83 Was Undisputedly Reasonable During Much of the Class Period.

Second, the Court should rule that there is no basis for a challenge to the reasonableness of GAM-83 for SLA-to-JSA conversions through much of the class period. Plaintiff alleges that GAM-83 is "40 years out of date," Compl. ¶¶ 2, 11, 61, 84, and seeks to recover for a class dating back to 1995, ECF 86 at 10. Yet his only support for the proposition that GAM-83 is decades out of date is the purported perspective of his expert Ian Altman, *who has testified precisely the opposite*, that the margin built into the GAM-71 mortality table rendered that table reasonable for JSA conversions 38 years after publication. Applying that same logic here, GAM-83—which has an even greater overall margin built in—necessarily was reasonable at least through 2021.

In *Traylor, Moses et al. v. Avnet, Inc.*, No. 08-cv-00918-PHX-FJM (D. Ariz.), Altman was retained to opine on whether a pension plan sponsor had sought to underpay participants. Ex. 10 at 4.[14] In his May 2009 report, Altman emphasized that it was not his role as an actuary to opine as to "how the law should be applied to pension plans," which is a legal issue. *Id.* at 7 (criticizing opposing expert for opining on "such matters as the proper interpretation of ERISA and the Internal Revenue Code, and the application of ERISA and the Code" to the plan at issue). He disclaimed any qualification to speak to the "serious legal dispute [in that case] about the interpretation and application of the relevant ERISA and Code provisions." *Id.* at 8. With respect to the subject matter he felt qualified to opine upon, Altman observed that whether "benefits are equivalent in

---

[14] Altman authenticated this report at his deposition in this case. Ex. 5 at 54-55.

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

value depends on the actuarial assumptions used to calculate the value of an annuity." *Id.* at 12; *Compare id. with Stephens*, 644 F.3d at 440 ("Two modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions.").

In that case, the plan determined the equivalence of benefits using the GAM-71 table—i.e., a table designed and published approximately twelve years before GAM-83 by the same organization, and 38 years before Altman's *Avnet* opinions. Ex. 10 at 12. Altman testified that the GAM-71 table was a "reasonable actuarial assumption[]" that the plan "use[d] for a variety of purposes," *id.*, including JSA calculations. Based on that assumption, the various benefit forms "provided by the Plan *are the actuarial equivalent of each other*." *Id.* at 14 (emphasis added).

Altman continued his report with extensive discussion of *why* GAM-71 was a reasonable actuarial assumption in 2009. *Id.* at 16. Although "more recently-constructed tables are available," he stated, "[t]his is not a sufficient basis on which to conclude that the GA71 table is unreasonable." *Id.* "Just because a table references 1971 mortality as its basis does not mean that it is 38 years out of date." *Id.* Altman noted that the GAM-71 table was constructed with "a significant margin to account for future mortality improvements"—8% for males and 10% for females. *Id.* at 17. He later noted that GAM-83, by comparison, has an even larger margin than GAM-71, 10% across the board. *Id.* Thus, "[t]he fact that later tables reflect improved mortality does not mean that 1971 GA is unreasonable." *Id.*[15]

Plaintiff has no evidentiary support for his contention that GAM-83 is "out of date" and "unreasonable" *other than* Altman. And if Plaintiff would like to rely on Altman for that assertion *starting in 2021* (38 years after 1983), Defendants acknowledge that this would be a dispute of material fact if reasonableness is required. But Altman's opinions in *Avnet* are fatal to the idea that GAM-83 was unreasonable for any lesser period than GAM-71, which had the same or smaller

---

[15] Altman further supported this conclusion by noting that GAM-71 was approved for nondiscrimination testing, "indicating that the IRS does not view the table as unreasonably out of date." Ex. 10 at 17. That is true of GAM-83 today. Ex. 2 ¶¶ 130-31; *see supra* at 12 n.6.

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

margin.  Nor can Plaintiff avoid summary judgment by now putting in an opinion from Altman contradicting his own prior opinions.  A party cannot "create" an issue of fact by injecting a witness's "contradict[ory]" testimony.  *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012).  When, as here, such a contradiction "is a sham" because the "inconsistency is clear and unambiguous," a contradiction of that kind does not create a fact issue precluding summary judgment.  *Id.* (citing *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009)); *see also Tarleton LLC v. State Farm Fire & Cas. Co.*, 2014 WL 2126567, at *8 (D. Or. May 21, 2014) (expert's reversal on key issue in the case was "clear[] contradict[ion]" that could not be invoked to avoid summary judgment); *Crandall v. Starbucks Corp.*, 249 F. Supp. 3d 1087, 1100 (N.D. Cal. 2017) (finding contradictory opinions to be a "sham").

Where Altman's sworn opinion is that GAM-71, given its substantial margin, remained reasonable for at least 38 more years, the Court plainly may conclude that the same is true of GAM-83, with an even higher margin.  If Plaintiff would like to contend at trial that GAM-83's reasonableness expired after 2021, that may be a disputed fact, but the Court should narrow the issues by determining now that GAM-83 was reasonable for JSA conversions at least until then.

## III.    THE COURT SHOULD DISMISS THE FIDUCIARY DUTY CLAIM.

### A.    The Court Should Dismiss the Breach of Fiduciary Duty Claim Entirely.

In Count III, Plaintiff alleges that the Administrative Committee breached its fiduciary duties by allowing the MPP to apply unlawful plan terms.  Compl. ¶¶ 71, 121-132.  That theory skips a step.  The "threshold question" in a breach of fiduciary duty claim is whether the actor "was acting as a fiduciary" in the action at issue.  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see also* 29 U.S.C. § 1002(21)(A) (defining "fiduciary").  Without a fiduciary *act*, there can be no fiduciary *breach*.  *See Pegram*, 530 U.S. at 226; *see also Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004) (ERISA fiduciary functions require exercise of discretionary authority or control of plan management).

Fiduciaries do not establish or amend plan terms—that is the plan sponsor's responsibility, for which "ERISA's fiduciary duty requirement simply is not implicated."  *Hughes Aircraft Co. v.*

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

*Jacobson*, 525 U.S. 432, 443-44 (1999).  This is why the court in *Scott* recently granted summary judgment on the breach of fiduciary duty claim in that case—because "it is well settled that, when a plan sponsor establishes or amends plan terms, they do not act as fiduciaries.'"  2025 WL 1903673, at *8 (cleaned up).  "[E]stablish[ing] the use of the challenged conversion factors" and any "decision not to change the conversion factors" are not fiduciary functions, and "[t]he oversight and control of plan terms" is more akin to the conduct of "the settlors of a trust."  *Id.* (quoting *Hughes*).  "[F]ollowing clear and mandatory Plan terms for the calculation of benefits," the court continued, is not an act that "involves the exercise of discretionary authority or control."  *Id.*  Intel's choice of actuarial assumptions, and its choice to maintain those assumptions, are not decisions for which fiduciaries to the MPP can be held liable.

In any event, the record permits no finding of any *breach*, for two reasons.  *First*, the Administrative Committee's "duty is to … maintain[]" the MPP according to its terms.  *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013) (quoting 29 U.S.C. § 1102(a)(1)).  Plaintiff's claim is premised on the Administrative Committee *correctly applying those terms*.  There can be no breach in that scenario.  *Scott*, 2025 WL 1903673, at *8.

*Second*, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  This case, as the Court has noted, presents a new theory of liability.  ECF 92 at 2 n.1.  Although the statutory and regulatory language is unchanged since the 1970s, *see* ECF 80 at 6-7, it was not until 2018 that the first enterprising plaintiff asserted that this static language had all along required the updating of actuarial assumptions used for JSA conversions.  *See* ECF 92 at 2 n.1.  The Administrative Committee cannot have failed to comply with its duties *for the past thirty years* in not having taken action that *no one* asserted was required until 2018.[16]

---

[16] Plaintiff may point to materials (cited in the class certification briefing) from the MPP's actuary, Mercer, regarding the impact on JSA conversions of longer lifespans.  But Mercer did not

**B.    At a Minimum, the Court Should Confirm That no Breach of Fiduciary Duty Claim is Available as to Benefits Commenced Before January 2017.**

ERISA's statute of repose bars recovery on a breach of fiduciary duty claim for any class member who commenced benefits more than six years prior to the filing of the complaint.  *See* 29 U.S.C. § 1113(1).  This is a "legislative judgment that a defendant should be free from liability" after that time.  *Cal. Pub. Emps. Ret. Sys. v. ANZ Secs., Inc.*, 582 U.S. 497, 505 (2017).  Here, the claimed breach occurred when the Administrative Committee "calculated retirement benefits using the Plan's outdated and unreasonable assumptions."  Compl. ¶ 71.  That calculation necessarily comes before any JSA benefit commences, and any class member who commenced a JSA benefit more than six years before this case was filed cannot recover for a breach of fiduciary duty as a matter of law.  *Urlaub*, 750 F. Supp. 3d at 873 (same).  As far as Defendants can tell, Plaintiffs have conceded this point.  *See* ECF 91 at 8-9 (citing *Urlaub*).[17]  Their claims for breach of fiduciary duty are barred.

**CONCLUSION**

For the foregoing reasons, the Court should enter judgment on the pleadings or summary judgment for Defendants.

---

recommend the MPP be amended in any way, and in fact conveyed that the existing assumptions were better overall for many participants.  Ex. 11 (Chakan Dep. 143-153).  It would be deeply unfair to send the Administrative Committee to trial for not having anticipated a new legal theory.

[17] Following the Court's Order on this motion, Defendants will meet and confer with Plaintiff as needed to identify the MPP JSA annuitants whose benefits commenced before January 23, 2017.  Defendants reserve for trial, if necessary, the question of whether the statutory claims (i.e., under Counts I and II) of all class members commencing benefits more than four years before this suit was filed also are barred by ERISA's statute of limitations.

Respectfully submitted,

Dated: September 12, 2025

By: /s/ David S. Kurtzer-Ellenbogen

WILLIAMS & CONNOLLY LLP
David S. Kurtzer-Ellenbogen (*pro hac vice*)
Daniel A. Martinez (*pro hac vice*)
Alexander C. Gaudio (*pro hac vice*)
dkurtzer@wc.com
gmartinez@wc.com
agaudio@wc.com
680 Maine Ave., S.W.
Washington, DC 20024
(202) 434-5000 / FAX (202) 434-5029

PROSKAUER ROSE LLP
Myron D. Rumeld (*pro hac vice*)
mrumeld@proskauer.com
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

Kelly Marie Curtis (Cal. Bar No. 313581)
kcurtis@proskauer.com
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone: (310) 557-2900
Facsimile: (310) 557-2193

*Attorneys for Defendants*