UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GREGG BERKELEY,<br><br>                    Plaintiff,<br><br>          v.<br><br>INTEL CORPORATION, et al.,<br><br>                    Defendants. | Case No.   5:23-cv-00343-EJD<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 96 |

This is a class action alleging that Defendants Intel Corporation ("Intel") and the Administrative Committee of the Intel Minimum Pension Plan ("Administrative Committee") (collectively, "Defendants") violated the Employee Retirement Income Security Act of 1974 ("ERISA") by using unreasonable actuarial assumptions to convert single life annuities ("SLAs") to joint survivor annuities ("JSAs") in the Intel Minimum Pension Plan ("MPP" or "Plan"). Compl., ECF No. 1.  Before the Court is Defendants' motion for judgment on the pleadings or, in the alternative, summary judgment.  Mot., ECF No. 96; Opp'n, ECF No. 99; Reply, ECF No. 102.

The Court held a hearing on February 5, 2026, and heard oral arguments from all parties. ECF No. 108.  For the reasons explained below, the Court **GRANTS** Defendants' motion.

I.      **BACKGROUND**

Intel established the MPP in 1988 as a backstop to its Retirement Contribution Plan ("RCP").  Mot., Ex. 3, MPP ("MPP"), ECF No. 96-4.  The MPP determines a minimum monthly annuity for each participant based on tenure and pay, and if a participant's RCP benefit falls below that minimum monthly annuity, the MPP makes up the difference.  *Id.*  While MPP benefits are first calculated as SLAs, benefits for married participants are typically converted to JSAs.  *Id.*

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
1

Under ERISA, JSAs for married retirees must be "the actuarial equivalent" of SLAs for single retirees. 29 U.S.C. § 1055(d). To accomplish this, pension plan administrators use actuarial assumptions such as mortality tables and interest rates to convert SLA payments to JSA payments. The MPP currently converts SLAs to JSAs using the mortality table published by the Society of Actuaries in 1983 ("GAM-83 mortality table") and interest rates set by the Pension Benefit Guaranty Corporation ("PBGC interest rates"). Mot., Ex. 3, MPP ("MPP"), ECF No. 96-4. These assumptions are also used consistently throughout the Plan for other purposes, including calculating participants' net-SLA benefits before converting SLAs to JSAs in the floor-offset plan. *See Berkeley v. Intel Corp.*, No. 5:23-CV-00343-EJD, 2025 WL 1785320, at *6 (N.D. Cal. June 27, 2025) (order granting class certification in this case and explaining the two phases of the MPP's JSA conversion).

Plaintiff Greff Berkeley ("Plaintiff") alleges that the GAM-83 mortality table and PBGC interest rates are outdated and unreasonable actuarial assumptions—only when they are used to convert SLAs to JSAs[1]—because they do not create "actuarial equivalent" benefits. Compl. ¶¶ 54–57. Instead, to comply with ERISA, Plaintiff argues the MPP must convert SLAs to JSAs using the higher interest rates and mortality tables periodically published by the Department of Treasury under 26 U.S.C. § 417(e). *Id.* ¶¶ 35–37.

The Court granted Plaintiff's motion for class certification on June 27, 2025. *See Berkeley*, 2025 WL 1785320. Relevant here, the Court found at least one common question germane to all claims and all class members—whether ERISA requires plans use "reasonable" actuarial assumptions to convert SLAs to JSAs. *Id.* at 2–4. Defendants now move for judgment, arguing in part that the answer to this question is no.

## II.    LEGAL STANDARD

A motion for judgment on the pleadings under Rule 12(c) challenges the legal sufficiency

---

[1] Plaintiff does not argue these actuarial assumptions violate ERISA when used in the floor-offset plan to calculate net-SLAs, or when used in other portions of the MPP. *See Berkeley*, 2025 WL 1785320, at *6–7.

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
2

United States District Court
Northern District of California

of the opposing party's pleadings and operates like a motion to dismiss under Rule 12(b)(6). *Morgan v. Cnty. of Yolo*, 436 F. Supp. 2d 1152, 1154–55 (E.D. Cal. 2006) *aff'd*, 277 F. App'x 734 (9th Cir. 2008). "[T]he same standard of review applicable to a Rule 12(b) motion applies to its Rule 12(c) analog," because the motions are "functionally identical." *Dworkin v. Hustler Mag., Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). The Court will "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). A district court generally may not consider materials beyond the pleadings in evaluating a Rule 12(c) motion. *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Summary judgment, on the other hand, may be granted only if the moving party shows "there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute when enough evidence exists in the record for a reasonable fact finder to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material when it might affect the outcome of the case. *Id.* When evaluating whether a moving party has satisfied this standard, courts view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). The moving party bears the initial burden of showing that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party would not bear the burden of persuasion at trial, the moving party may demonstrate the absence of a genuine issue by either negating or showing a lack of evidence supporting an essential element of the nonmoving party's claim. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets that burden, the opposing party must produce affirmative evidence "from which a jury could find in [its] favor" to defeat summary judgment. *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).

Here, the parties have completed discovery and present evidence to support their respective positions on Defendants' motion. Because, as discussed below, the Court finds it necessary to

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
3

United States District Court
Northern District of California

examine the evidence presented, the Court will proceed under the Rule 56 summary judgment standard rather than the Rule 12 standard for judgment on the pleadings.

## III.   DISCUSSION

Plaintiff claims that Defendants' use of unreasonable actuarial assumptions in SLA-JSA conversions violates: (1) the joint and survivor annuity requirements in 29 U.S.C. § 1055; (2) the anti-forfeiture rules of 29 U.S.C. § 1053; and (3) the Administrative Committee's fiduciary duty to the class.  Defendants seek judgment on all claims. [2]  The Court will address each in turn.

### A.   "Reasonable" Actuarial Assumptions Under § 1055

The first question is whether actuarial equivalence under 29 U.S.C. § 1055 requires that pension plans use "reasonable" actuarial assumptions to convert SLAs to JSAs.

Before the Court begins, it briefly addresses a new argument Plaintiff raised for the first time during the February 5, 2026, hearing—that Plaintiff *never claimed* actuarial assumptions must be "reasonable" under § 1055, only that they create "equivalent" benefits.  The Court need go no further than Plaintiff's own complaint to find this representation is not true.  Plaintiff's core allegation is that he "suffered harm from Defendants' use of the Plan's outdated and *unreasonable* actuarial assumptions," and his monthly pension payments would have been larger if his benefits were "determined using *reasonable* actuarial assumptions."  Compl. ¶ 22 (emphasis added); *see also, e.g., id* ¶ 16 (seeking "reformation of the Plan to provide for reasonable actuarial assumptions as to Class members"), ¶ 34 (alleging that, "[i]n order for the economic value of benefits to be equivalent, the assumptions used to perform an actuarial equivalence computation must be reasonable"),[3] ¶ 62 (alleging "the Plan's actuarial assumptions are outdated and unreasonable" when used to convert SLAs to JSAs), ¶ 71 (alleging "the Administrative Committee breached its fiduciary duties and instead calculated retirement benefits using the Plan's outdated

---

[2] The Court need not reach remaining arguments regarding narrowing issues for trial.

[3] The Court observes, however, that Plaintiff directly contradicted this allegation during oral arguments.  02/05/2026 Tr. 20:12–14 ("The Court: So someone could use an unreasonable factor as long as there is equivalence. Mr. Martin: Exactly right.").

United States District Court
Northern District of California

and unreasonable assumptions"), ¶ 92.D (identifying as a common question of law whether the Administrative Committee is "required to calculate benefits for Class members based on reasonable actuarial equivalence calculation"); *see also id.* ¶¶ 10, 35, 38, 43, 103 (alleging that the "reasonableness" language in Treasury regulations echoes ERISA's actuarial equivalence requirements); *see also id.* ¶¶ 63, 64, 66, 79 (alleging that class members would have received higher benefits had the MPP used "reasonable" actuarial assumptions).

Central to Plaintiff's claim is the assumption that "reasonableness" and "equivalence" are not distinct—in Plaintiff's own words, "[i]n order for the economic value of benefits to be *equivalent*, the assumptions used to perform an actuarial equivalence computation must be *reasonable*." *Id.* ¶ 34 (emphasis added). Indeed, Plaintiff previously represented that one question common to all class members is "whether ERISA requires actuarial assumptions for SLA-to-JSA conversions to be 'reasonable,'" which the Court relied on in finding commonality satisfied. Mot. for Class Cert., ECF No. 12; *Berkeley*, 2025 WL 1785320, at *3. And consistent with this position, Plaintiff's opposition to the present motion begins with the argument that actuarial equivalence "demand[s] the use of reasonable assumptions." Opp'n 1. The Court is perplexed as to how Plaintiff now represents that "reasonableness is [Defendants'] argument, not ours." 02/05/2026 Tr. 19:9–10, ECF No. 110; *see also id* 19:24–20:4 ("And let me tell you, reasonableness is their argument. So we say it's not accurate. They then say, well surely we don't have to be perfectly accurate, surely as long as we do something reasonable. And we are not idiots, we respond to that and we respond to that by our expert saying it's not even reasonable."). The record is clear: Plaintiff's theory has consistently been that actuarial equivalence under § 1055 requires the use of "reasonable" actuarial assumptions, of which the GAM-83 mortality table and PBGC interest rates are not. The Court will therefore not consider this new unpled and unbriefed theory introduced for the first time during oral argument. [4] *See Acasio v. Lucy*, No. 14-CV-04689-JSC, 2017 WL 1316537, at *10 (N.D. Cal. Apr. 10, 2017) (finding it "unfair and prejudicial to

---

[4] Perhaps Plaintiff pivoted in recognition of his concession at the hearing that two things can be of "equivalent" value, even if they are not calculated using "reasonable" factors. *See id.*

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
5

United States District Court
Northern District of California

raise new arguments and authorities for the first time at oral argument").

Moving to the substance of the parties' arguments—whether "actuarial equivalence" requires the use of reasonable actuarial assumptions is a question of statutory interpretation. Section 1055(d) provides only that a JSA must be "the actuarial equivalent" of the corresponding SLA, but it does not define that term, nor does it include a "reasonableness" requirement. Absent express language, the question becomes whether "reasonableness" is implied by and therefore inherent in § 1055(d)'s text.

The Court will examine the parties' arguments on ERISA's statutory interpretation in three parts: (1) ordinary meaning; (2) congressional intent, including (a) ERISA's purpose, (b) ERISA's structure, and (c) congressional history; and (3) the Department of Treasury's use of "reasonable" in a regulation regarding SLA-JSA conversions.

### 1.    Ordinary Meaning

First, the parties dispute the ordinary meaning of "actuarial equivalent." Defendants argue actuarial equivalence means that "[t]wo modes of payment" are "equal under a given set of assumptions." Mot. 6–7 (quoting *Stephens v. U.S. Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (defining actuarial equivalence for purposes of § 1054(c)(3) lump-sum payments)). Under this definition, actuarial equivalence articulates a mathematical principle devoid of any "reasonableness" implication. In support, Defendants cite a 1976 report from the Society of Actuaries titled "Report on Actuarial Terminology for Pension Plans in 1976." Reply, Ex. 12, ECF No. 102-2. This report sought to "standardize and clarify" actuarial terms to "achiev[e] compliance" with ERISA, and it defines "actuarial equivalence" as "[t]he situation where two or more items have an equal actuarial present value under a selected set of actuarial assumptions." *Id.* Discussions of "reasonableness" are notably absent from this report.

Plaintiff relies primarily on his expert witness Ian H. Altman's opinion to argue the ordinary meaning of actuarial equivalence requires the use of "reasonable" actuarial assumptions. Opp'n, Ex. 2 ("Altman Rebuttal Report"), ECF No. 99-3; Mot., Ex. 9 ("Altman Report"), ECF No. 96-10. Altman bases his opinions on dictionary definitions and language from the Actuarial

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

Standards of Practice ("ASOPs"). As for dictionary definitions, Altman defines "equivalent" as equal in value; "actuarial" as relating to actuaries or their work of compiling and analyzing statistics to calculate insurance risks and premiums; and "reasonable" as just, rational, appropriate, ordinary or usual in the circumstances. *Id.* at 9–10. Regarding language from the ASOPs, Altman argues that two sections also imply a reasonable requirement. First, a section regarding financial analyses provides that "an assumption is *reasonable* if it takes into account current and historical data that is relevant to selecting the assumption for the measurement date, to the extent such relevant data is reasonably available." *Id.* at 10 (emphasis added). Second, a section regarding demographic analyses provides that assumptions should reflect "appropriate experience from the specific plan and other relevant sources; and relevant factors known to the actuary that may affect future experience." *Id.* Taken together, Altman opines that "actuarial equivalence" requires actuaries use their ordinary practices to generate actuarial assumptions, and the ASOPS reflect that ordinary actuarial practice is to use the most up-to-date, or "reasonable," mortality and interest rates. *Id.* To the extent that Defendants' evidence may conflict with Altman's opinion, Plaintiff contends that this is a question of fact inappropriate for summary judgment.

District courts across the country are split on this issue. In *Belknap v. Partners Healthcare Sys., Inc.*, the court found the ordinary meaning of actuarial equivalence did not imply the use of "reasonable" actuarial assumptions because no dictionary definition included a reasonableness requirement, and there was no industry practice of calculating actuarial equivalence according to "reasonable" criteria outside the terms of the relevant plan itself. 588 F. Supp. 3d 161 (D. Mass. 2022) ("Thus, it appears that it is industry practice to refer to the plan documents to determine the actuarial assumptions used to calculate an actuarially equivalent benefit. In fact, the only place where "actuarial equivalence" is defined, that is relevant here, is within the Plan itself."). Similarly, the court in *Drummond v. S. Co. Servcs., Inc.*, found no clear authority mandating that actuarial equivalence requires the use of reasonable actuarial assumptions. No. 2:23-CV-00174-SCJ, 2024 WL 4005945 (N.D. Ga. July 30, 2024). On the other hand, the courts in *Urlaub v. CITGO Petroleum Corp.*, No. 21 C 4133, 2022 WL 523129, at *6 (N.D. Ill. Feb. 22, 2022), and

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
7

United States District Court
Northern District of California

*Paieri v. W. Conf. of Teamsters Pension Tr.*, No. 2:23-CV-00922-LK, 2024 WL 3455269, at *10 (W.D. Wash. June 21, 2024), found reasonableness implied because they were persuaded by arguments that only accurate and reasonable actuarial assumptions can convert benefits from one form to another in a way that results in equal value between the two. And taking a different approach, a court in this district recently found that whether to imply reasonableness is a question of fact, and the competing expert opinions there rendered the issue inappropriate for summary judgment. *Scott v. AT&T, Inc.*, 790 F. Supp. 3d 781, 2025 WL 1903673 (N.D. Cal. July 9, 2025). The Sixth Circuit is the only court of appeals to have weighed in on this issue in a recent March 2026 decision. *Reichert v. Kellogg Co.*, No. 24-1442, 2026 WL 734673, at *11 (6th Cir. Mar. 16, 2026).[5] In *Reichert*, the majority relied on historical actuarial practices and essentially found that "a core part of [actuaries'] job is to perform calculations and make predictions based on real-world conditions," and conditions reflecting the real world should be "reasonable." *Id.* at 7. The dissent disagreed, finding reasonableness "conspicuously absent" from any dictionary definition or the process actuaries use to calculate actuarial equivalence. *Id.* at 12–13.

Based on the record before it—particularly, the 1976 Society of Actuaries Report—the Court agrees with Defendants that "actuarial equivalence" merely reflects a mathematical principle, devoid of an implied "reasonableness" requirement. Published only two years after ERISA's passage, the Society of Actuaries Report reveals that actuarial equivalence at that time meant "[t]he situation where two or more items have an equal actuarial present value under a selected set of actuarial assumptions." This evidence was not examined by the Sixth Circuit in *Reichert*,[6] or the district courts in *Urlaub*, *Paieri*, or *Scott*. And Altman's opinions do not meaningfully challenge this definition to create a dispute of fact. The dictionary definitions Altman cites contain no mention of reasonableness; the first quoted section of the ASOPs defines

---

[5] The Sixth Circuit published this decision after the Court had taken Defendants' motion under submission.

[6] However, the Court observes the report was noted in the Supplemental Brief of Appellees, 2025 WL 1575721, at *5.

"reasonableness," but it does not indicate that reasonableness is implied in the definition of "actuarial equivalence"; and the second ASOPS section merely provides that actuarial assumptions should include "relevant" assumptions, not "reasonable" assumptions. Altman also notably provides no opinion regarding the meaning of "actuarial equivalence" at the time Congress enacted ERISA—he cites to his modern experiences, modern dictionary definitions, and ASOPs published in June 2020. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332, 135 S. Ct. 831, 841, 190 L. Ed. 2d 719 (2015) (noting experts may provide opinion that "a certain term of art had a particular meaning to a person of ordinary skill in the art at the time of the invention").

Similar to *Belknap* and *Drummond*, the evidence here does not show that the ordinary meaning of actuarial equivalence at the time Congress enacted ERISA implies a requirement of reasonableness. Instead, the evidence supports Defendants' position that actuarial assumptions need not necessarily be "reasonable" to create SLAs and JSAs of "actuarially equivalent" value.

### 2.    Congressional Intent

The Court will next examine the parties' congressional intent arguments in three parts: (1) the purpose of ERISA; (2) the structure of ERISA; and (3) congressional history.

#### a.    Purpose of ERISA

Plaintiff spends much of his argument stressing the purpose of ERISA, which was "to ensure a stream of income to surviving spouses." *Boggs v. Boggs*, 520 U.S. 833, 843 (1997). Without reasonableness, Plaintiff argues that this spousal protection would be meaningless, and courts generally reject readings that render statutory terms "insignificant, if not wholly superfluous." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). Defendants essentially respond that this is a policy argument more appropriate for Congress, not the Court.

The courts that have considered this argument side with Plaintiff. *See Reichert*, 2026 WL 734673, at *10 (noting ERISA's purpose to "ensure a stream of income to surviving spouses"); *Urlaub*, 2022 WL 523129, at *6 ("[I]t cannot possibly be the case that ERISA's actuarial equivalence requirements allow the use of unreasonable mortality assumptions. Taken to the

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
9

extreme, the defendants' argument suggests that they could have used any mortality table—presumably, even one from the sixteenth century—to calculate the plaintiffs' JSAs. If this were true, the actuarial equivalence requirement would be rendered meaningless."); *Masten v. Metro. Life Ins. Co.*, 543 F. Supp. 3d 25, 35 (S.D.N.Y. 2021) ("Allowing plans to set their own definition of actuarial equivalence would eliminate any protections provided by that requirement. The Act must therefore be read to impose some boundaries on the determination of equivalence."); *Paieri*, 2024 WL 3455269, at *10 (agreeing with prior district court cases).

However, the Court finds Defendants' position here more persuasive as well.  The parties agree that the purpose of § 1055(d) was to provide a stream of income to surviving spouses.  But there is no evidence that Congress enacted § 1055(d) to ensure that pension plans provide *maximum* available benefits to married participants requiring continuously updated "reasonable" actuarial assumptions.

Plaintiff's concern that such a conclusion would allow the use of sixteenth century mortality tables and render § 1055 meaningless—a concern shared by and primarily relied upon by the Sixth Circuit in *Reichert* and several district courts—is well-taken, though not informative here.  This could be persuasive if Intel used mortality tables from the sixteenth century for SLA-JSA conversions when it created the Plan in 1988.  But there are two critical differences between that hypothetical and the case before the Court.

First, the question here is whether Defendants must fulfill an *ongoing* obligation to ensure that actuarial assumptions remain "reasonable" over time to accomplish ERISA's purpose, not whether the GAM-83 mortality table and the PBGC interest rates were reasonable at the time the MPP was created.  There is no dispute here that the GAM-83 mortality table and the PBGC interest rate fulfilled ERISA's purpose when the MPP was created in 1988.  It appears this was not a point considered by the Sixth Circuit in *Reichert* or the district courts cited above.

Second, the GAM-83 mortality table and PBGC interest rates are used consistently throughout the Plan, including when calculating net-SLAs and converting SLAs to JSAs, such that there is no arbitrary use of older assumptions only for the purpose of SLA-JSA conversions. As

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
10

Plaintiff conceded during the hearing, two things can be equal in value, even if they are both calculated using "unreasonable" assumptions. Here, the GAM-83 mortality table and PBGC interest rates are used consistently throughout the Plan to not only convert SLAs to JSAs, but also to, for example, calculate the net-SLA benefits in the floor-offset plan. *See Berkeley*, 2025 WL 1785320, at *6 (explaining benefits calculations).

In other words, the Court's Order would not reach as far as Plaintiff suggests—this Order does not authorize employers to arbitrarily choose whichever actuarially assumptions they like to convert SLAs to JSAs without regard for actuarial equivalence or consistency throughout the plan.

**b.      Structure of ERISA and Use of "Reasonable" in Other Sections**

The parties also dispute the significance of Congress's use of "reasonable" in other sections of ERISA. Defendants highlight that ERISA has a "carefully crafted and detailed enforcement scheme," *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 953 (9th Cir. 2014), where courts should be "especially reluctant to tamper with the . . . scheme" by "extending remedies not specifically authorized by its text." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (internal quotation mark omitted) (cleaned up). Against this backdrop, Defendants argue that if Congress wanted to require reasonableness in the definition of "actuarial equivalence," it would have done so; instead, "actuarial equivalence" under § 1055(d) was intended to leave plan sponsors with the discretion to use actuarial assumptions based on the structure and design of that specific plan. To illustrate this point, Defendants highlight that Congress required reasonable actuarial assumptions five times in ERISA and used the term "reasonable" seventy-six times, but never in 29 U.S.C. § 1055(d). *See, e.g.,* 29 U.S.C. § 1393(a) (requiring employers compute withdrawal liability using actuarial methods that "in the aggregate[] are reasonable"), § 1085 (mandating that endangered plans use "reasonable actuarial estimates, assumptions, and methods" for annual certifications, adopt funding improvement plans based on "reasonable actuarial assumptions," and "reasonable actuarial assumptions" when developing "rehabilitation plans"), § 1085a (requiring that plan asset valuations be performed through a "reasonable actuarial method of valuation" and specifying that, for purposes of minimum funding

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
11

under that section, plan assumptions must be determined "on the basis of actuarial assumptions and methods . . . each of which is reasonable"), § 1083 (containing "reasonableness" requirements in funding standards for single-employer and multi-employer plans), § 1084 (same), § 1055(g) (requiring specific actuarial assumptions, though not using the word "reasonable").

Plaintiff responds that the focus of this inquiry should be on the meaning of § 1055(d)'s text, not different sections of Title 29, and any inference from other provisions cannot override the plain language requiring a JSA to be "actuarial equivalent" to an SLA—which, again, Plaintiff argues infers a "reasonableness" requirement. Plaintiff also argues that the sections Defendants cite are too different in language, structure, and circumstances to apply to § 1055(d).

Again here, courts are split. The district court in *Drummond* found "the omission of a reasonableness requirement [] telling" given that "'ERISA is a comprehensive and reticulated statute, which Congress adopted after careful study of private retirement pension plans.'" *Drummond*, 2024 WL 4005945, at *5 (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510, (1981)); *see also Belknap*, 588 F. Supp. 3d at 170 (finding the Supreme Court's "reluctance" to tamper with ERISA's enforcement scheme "particularly warranted" when interpreting § 1054(c)(3) given Congress's use of "reasonable" in other sections). The Sixth Circuit in *Reichert*, however, found that the same ERISA sections cited by Defendants here were too "dissimilar" to § 1055 to "presume[]" Congress meant anything by excluding similar "reasonableness" language in § 1055. *Reichert*, 2026 WL 734673, at *10.

The Court ultimately agrees with Defendants here as well. The Supreme Court was clear in *Great-W. Life* that "ERISA's carefully crafted and detailed enforcement scheme provides strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly." *Great-W. Life*, 534 U.S. at 209. Within this context, Congress's use of a "reasonableness" requirement in other ERISA provisions, and identification of specific actuarial assumptions to calculate other payments, particularly persuades the Court that if Congress

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
12

intended to impose a similar requirement to SLA and JSA conversions, it would have done so. [7]

The fact that the other sections using "reasonable" reference different formulations addressing different circumstances does not persuade the Court otherwise. It is true that, as the Sixth Circuit noted in *Reichert*, courts may generally only "presume" Congress intentionally excluded language in one section of a statute when it included that language in another *similar* section of the statute. *Reichert*, 2026 WL 734673, at *10 (*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435–36 (2002)). But the Court is not making presumptions regarding Congress's intent under this general cannon of statutory interpretation. Instead, the Court is operating in the specific context of ERISA, which the Supreme Court has explicitly identified as a "comprehensive and reticulated statute, the product of a decade of congressional study of the Nation's private employee benefit system." *Great-W. Life*, 534 U.S. at 209 (2002) (internal quotation marks omitted) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993)). The Supreme Court—without reference to the general presumption doctrine discussed in *Reichert*—has been clear that within the context of ERISA, Congress "did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Id.* (emphasis in original) (quoting *Mertens*, 508 U.S. at 254).

### c.    Congressional History

Finally, Defendants introduce two other insights from congressional history to argue that "actuarial equivalent" does not imply the use of "reasonable" actuarial assumptions.

First, Congress passed a law in 1953 allowing retired members of the U.S. uniformed services to voluntarily reduce their retirement pay to provide a survivor annuity for their widow or dependent children. *See* Uniformed Services Contingency Option Act of 1953, Pub. L. No. 83-239, 67 Stat. 501, 503. This law expressly required that "appropriate actuarial tables" or "actuarial tables . . . in effect at that time" be used to determine certain "actuarial[ly] equivalent" benefits.

---

[7] The Court notes Plaintiff's cited case law did not examine whether the structure of ERISA supports inferring a "reasonableness" requirement in § 1055. *See, e.g., Smith v. Rockwell Automation, Inc.*, 438 F. Supp. 3d 912 (E.D. Wis. 2020) (assuming reasonableness).

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
13

*Id.* Under Plaintiff's interpretation of "actuarial equivalent," Defendants argue there would have been no need for Congress to mandate that those mortality tables be "appropriate" or contemporary because such requirements would have already been inferred. Defendants also argue more broadly that the reference to reasonableness in this law regarding government-funded retirement plans intentionally reflects a critical difference between public and private contracts. In the context of private pension plans, companies require consistency when calculating benefits so they can predict outputs and ensure profitability; whereas in government contracts, predictability carries less importance given the government's ability to fulfill contracts regardless of "profits." Second, Defendants highlight that during ERISA's drafting, Senator Mondale offered an amendment that would have required JSAs to be determined using "reasonable actuarial methods approved by the Secretary [of Labor]." Reply, Ex. 17, ECF No. 102-7. But Congress did not adopt that amendment, and Defendants contend that the Court should not impose that result via judicial order now.

As for the Uniformed Services Contingency Option Act, Plaintiff argues this was passed too far in advance of the passage of ERISA and so carries no relevance here. As for the rejection of Senator Mondale's amendment, Plaintiff argues the amendment would have imposed an obligation on the *Department of Labor* to choose reasonable actuarial assumptions, and the rejection of that amendment is the rejection of placing that onus on the Department of Labor.

The Court finds some of this history also supports Defendants' position. While the Uniformed Services Contingency Option Act was passed long before ERISA, it serves as another example of Congress choosing to specify the types of actuarial assumptions to be used in specific scenarios, rendering their silence in § 1055(d) even more notable. The Court also agrees that requiring mortality tables in Uniformed Services Contingency Option Act be "appropriate" or contemporary would be superfluous if Plaintiff is correct that "actuarial equivalence" already requires the use of reasonable, appropriate, and contemporary assumptions. However, the Court notes that the meaning behind Congress's rejection of Senator Mondale's amendment is less clear. It could be equally true that Congress rejected the amendment because it required the Department

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
14

of Labor to publish actuarial assumptions, or because it required the use of "reasonable" assumptions.

* * *

Considering the purpose, structure, and history of ERISA, the Court finds no evidence that Congress intended to require the use of "reasonable" actuarial assumptions to achieve actuarial equivalence under § 1055(d).

### 3.    Department of Treasury Regulation

Finally, the parties dispute the importance of a Department of Treasury regulation requiring that companies use "reasonable" actuarial factors for lump-sum SLA-JSA conversions to qualify for tax exemptions.

Plaintiff argues that the Department of Treasury's interpretation of parallel provisions in the IRS Code, 26 U.S.C. § 401, support reading a "reasonableness" requirement into § 1055. Specifically, the regulation provides:

> A qualified joint and survivor annuity must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan. Equivalence may be determined, *on the basis of consistently applied reasonable actuarial factors*, for each participant or for all participants or reasonable groupings of participants, if such determination does not result in discrimination in favor of employees who are officers, shareholders, or highly compensated.

26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added).  Though Plaintiff admits this regulation is not authoritative, he argues this section is nevertheless persuasive because it reflects that "actuarial equivalence" has been understood to include "reasonableness" since ERISA's inception. Defendants contend that Treasury's regulation is not enforceable under ERISA and that the Secretary of the Treasury is not the appropriate agency official to interpret ERISA.

The Court ultimately agrees that this regulation is of little consequence here.  While, as noted in *Reichert*, Congress has conferred on the Department of Treasury the authority to interpret certain provisions of ERISA (including § 1055), the regulation at issue here does not purport to interpret § 1055; it interprets a parallel provision in the IRS Code, 26 U.S.C. § 401.  There are no

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Treasury regulations that define "actuarial equivalence" in the context of § 1055 annuity benefits, and the regulation's governing of tax qualifications based on lump-sum conversions is not controlling over how the Court should interpret ERISA. *See, e.g., Belknap*, 588 F. Supp. 3d at 171 (finding regulation does not support reasonableness requirement because there are no Department of Treasury regulations that define "actuarial equivalence" in the context of annuity benefits); *Drummond*, 2024 WL 4005945, at *6 (finding 26 C.F.R. § 1.401(a)-11(b)(2) not enforceable under ERISA and declining to write into § 1055(d) a requirement that appears solely under a Tax Code regulation).

### 4.      § 1055 Conclusion

The Court finds Defendants have met their burden to show that § 1055 does not require continuously updated "reasonable" actuarial assumptions to convert SLAs to JSAs. The evidence does not show that a "reasonableness" requirement may be inferred from the ordinary meaning of "actuarial equivalent," from congressional intent, or from Department of Treasury regulations. Accordingly, the Court **GRANTS** summary judgment on Count I.

### B.      Forfeiture Under § 1053

Moving to Count II, Plaintiff alleges that Defendants' use of the GAM-83 mortality table and PBGC interest rate violates 29 U.S.C. § 1053. This anti-forfeiture section provides that an employee's right to their vested retirement benefits is non-forfeitable and states that paying a participant less than the actuarial equivalent value of their accrued benefit results in an illegal forfeiture of vested benefits. *See* 29 U.S.C. § 1053(a).

Defendants argue that Plaintiff's claim for forfeiture under § 1053(a) fails alongside his § 1055 claim. Plaintiff argues this is an artificial conflation because § 1053(a) is a distinct statutory protection that does not turn on the meaning of "actuarial equivalence." Instead, § 1053(a) prohibits a plan from unlawfully decreasing the value of an accrued benefit through any conduct, including *but not limited to* Plaintiff's theory of unreasonable actuarial assumptions.

The Court agrees with Plaintiff that a § 1053 claim is not necessarily derivative of a § 1055 claim in all circumstances. But here, Plaintiff relies on the same theory for both claims—that

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
16

Defendants unlawfully decreased the value of his benefits under § 1053 because the MPP applied unreasonable actuarial assumptions in violation of § 1055. *See* Compl. ¶¶ 63, 64, 66, 79 (alleging that class members would have received higher benefits had the MPP used "reasonable" actuarial assumptions). Absent an alternative theory, the Court agrees that Plaintiff's § 1053 claim is tied to his § 1055 claim.

The Court therefore **GRANTS** summary judgment as to Count II.

### C.      Fiduciary Claims

Finally, Plaintiff alleges that the Administrative Committee breached its fiduciary duty to the class by calculating benefits using the GAM-83 mortality table and PBGC interest rate and failing to communicate to class members the detrimental impact of these actuarial assumptions. ERISA § 1109 mandates that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a).

Among other arguments, Defendants contend that the Administrative Committee (sometimes referred to as "RPAC") had no fiduciary duty to create or amend the MPP's terms— that was the duty of the plan sponsor, Intel. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443–44 (1999) (finding "ERISA's fiduciary duty requirement simply is not implicated" in claims against plan administrators); *Scott*, 790 F. Supp. 3d 781 (entering judgment on fiduciary claim because the defendant had no control over the plan terms). Accordingly, Defendants argue that Intel's choice of actuarial assumptions, and its choice to maintain those assumptions, are not decisions for which fiduciaries to the MPP can be held liable.

Plaintiff argues that whether the Administrative Committee had the fiduciary duty to amend the MPP's terms is a question of fact because, unlike *Hughes* and *Scott*, the Plan here

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
17

United States District Court
Northern District of California

expressly granted Administrative Committee the discretionary authority to correct plan defects. 29 U.S.C § 1002(21)(A)(iii) ("[A] person is a fiduciary with respect to a plan to the extent … he has any discretionary authority or discretionary responsibility in the administration of such plan"). Plaintiff also highlights the Supreme Court's acknowledgement in *Pegram v. Herdrich* that the authority to administer the plan could possibly create a fiduciary duty for plan administrators. 530 U.S. 211, 223 (2000) ("And as we have already suggested, although Carle is not an ERISA fiduciary merely because it administers or exercises discretionary authority over its own HMO business, it may still be a fiduciary if it administers the plan."). Further, regardless of the grant of discretionary authority, Plaintiff argues the Administrative Committee is still responsible for ensuring that participants receive all legally required benefits, so they are also responsible for ensuring that their instructions from the Plan's terms do not violate ERISA. In other words, all fiduciaries that are responsible for administering a pension plan may only follow a plan's terms if they adhere to ERISA's substantive requirements.

The Court finds Count III fails simply because, as discussed above, the evidence does not support Plaintiff's allegations that the use of the GAM-83 mortality table and PBGC interest rates violated ERISA. But even if this were not the case, the Court also finds no support for the proposition that the MPP authorizes the Administrative Committee to change the actuarial assumptions in the JSA conversions. [8] The cited provision specifically provides:

> The Administrative Committee, on behalf of the Participants and Beneficiaries, shall enforce and administer the Plan and the Trust Agreement, *in accordance with the terms of the Plan and the Trust Agreement*, and shall have all powers necessary and appropriate to accomplish that purpose, including, without limitation, the following powers: . . . . To correct any defect, *including but not limited to mathematical or arithmetical errors*, in such manner and to such extent as the Administrative Committee shall deem necessary to carry out the purposes of the Plan, including through governmental correction programs for retirement plans.

---

[8] And further, if the Court considered the Administrative Committee's general "duty [] to . . . maintain[]" the MPP according to its terms, *Heimeshoff v. Hartford Life & Acc. Co.*, 571 U.S. 99, 108 (2013) (quoting 29 U.S.C. § 1102(a)(1)), there is also no evidence that it breached this duty—Plaintiff alleges that the Administrative Committee correctly applied the terms of the plan to Plaintiff and the class.

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
18

MPP § 10(e)(xii) (emphasis added). This section does not grant the Administrative Committee the authority to amend the MPP's actuarial assumptions and as a result expose them to liability as to the "reasonableness" of the assumptions. Instead, the Court finds this provision contemplates granting the Administrative Committee with the discretion to correct ministerial or practical errors ("mathematical or arithmetical"). There is no evidence that the MPP goes so far as to authorize the Administrative Committee to change the core plan terms that dictate benefit calculations and drive the sponsor's payment obligations.

The Court therefore **GRANTS** summary judgment as to Count III.

## IV.    CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendants' motion for summary judgment.

**IT IS SO ORDERED.**

Dated: April 8, 2026

_____
EDWARD J. DAVILA
United States District Judge

Case No.: 5:23-cv-00343-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
19